# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30067

United States Court of Appeals
Fifth Circuit

**FILED**
July 8, 2015

Lyle W. Cayce
Clerk

ELZIE BALL; NATHANIEL CODE; JAMES MAGEE,

> Plaintiffs - Appellees Cross-Appellants

v.

JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY
AND CORRECTIONS; BURL CAIN, WARDEN, LOUISIANA STATE
PENITENTIARY; ANGELA NORWOOD, Warden of Death Row;
LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,

> Defendants - Appellants Cross-Appellees

Appeals from the United States District Court
for the Middle District of Louisiana

Before REAVLEY, JONES and ELROD, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In 2006, Louisiana built a new state-of-the-art prison facility to house death-row inmates. The cells in that facility, located in Angola, Louisiana, lack air conditioning. Three inmates sued the Louisiana Department of Corrections (the "State") and various prison officials in their official capacities,[1] claiming

---

[1] The officials include James M. LeBlanc, Secretary of the Louisiana Department of Public Safety and Corrections; Nathan Burl Cain, Warden of the Louisiana State Penitentiary in Angola; and Angela Norwood, Assistant Warden in charge of death row. We refer to all appellants collectively as "the State" because suit against officials in their official capacity only is essentially against the State of Louisiana.

No. 14-30067

that the heat they endure during the summer months violates the Eighth Amendment because of their pre-existing medical problems. They also assert that the failure to provide air conditioning violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act ("RA"), 29 U.S.C. § 794. After a bench trial, the district court sustained the prisoners' Eighth Amendment claims, rejected their disability claims, and issued an injunction effectively ordering the Defendants to install air conditioning throughout death row.

Although the trial court's findings of deliberate indifference by prison officials to these particular inmates' serious heat-related vulnerability suffice to support a constitutional violation, the scope of its injunctive relief exceeds our prior precedent, *Gates v. Cook*, 376 F.3d 323, 339 (5th Cir. 2004), and the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. Despite an oversight concerning applicable law, the court did not err in rejecting the prisoners' disability claims. We affirm in part, but vacate and remand the court's injunction for further consideration.[2]

## BACKGROUND

Angola's 25,000 square-foot death-row facility[3] consists of a pod surrounded by four housing wings. Inside the pod are administrative offices, visitation rooms, a medical and dental clinic, a control center, and an execution chamber. Within each of the four housing wings, two tiers of cells sit back-to-back. Each tier is lettered A through H. None of the housing tiers are air conditioned, but the rest of the facility is. To alleviate the summer heat, windows (which can be opened) line the exterior wall of each housing tier. Next

---

[2] Our issuance of this ruling renders moot the Plaintiffs' request that we lift the stay pending appeal.

[3] The death row unit is one of several buildings collectively known as the "Louisiana State Penitentiary" or "Angola." Only the death-row facility is implicated here, however.

to the windows are 30-inch fans, which serve two adjoining cells. Inside each cell is a six-by-eight-inch vent that draws air into the cell from the window across the tier and vents outside.

Although death-row inmates spend twenty-three hours a day in their cells, in-cell sinks provide unlimited access to potable water. Inmates also enjoy access to ice. Each housing tier has an ice chest, which the Angola staff maintains. Inmates can only access the chest themselves during the one hour a day they are allowed to walk the tiers. The rest of the time inmates depend on guards or other inmates for ice.[4] The uncontroverted evidence shows that the ice chests run out from time to time, either because the lone ice machine cannot generate enough ice or it breaks.

The three plaintiffs here, Elzie Ball, Nathaniel Code, and James Magee, are long-time residents of Angola's death-row facility. Magee lives on tier A, while Ball and Code live on tier H. Each suffers from various conditions: all three prisoners have hypertension; Ball has diabetes and is obese; Code is also obese and has hepatitis; and Magee is depressed and has high cholesterol. They take a variety of medications to control their ailments. According to the inmates, the extreme heat, not ameliorated by air conditioning, exacerbates their ailments, causing dizziness, headaches, and cramps.

Each inmate filed administrative complaints explaining that the heat was exacerbating his conditions and requesting air conditioning. The Defendants denied their requests. Internal appeals of the rulings were unsuccessful. Consequently, in June 2013, the inmates sued the Louisiana Department of Corrections and prison officials asserting claims under the

---

[4] Inmates can distribute ice to other inmates during the one hour they are allowed to walk the tiers. If, however, those inmates spend their free hour in recreation or showering, then the other inmates may not receive ice.

No. 14-30067

Eighth Amendment's ban on cruel and unusual punishment and violations of the ADA and RA. As relief, the prisoners sought an injunction requiring the state to keep the heat index at or below 88° F.

A month later, the district court appointed United States Risk Management ("USRM") to monitor the temperature at the facility. During the monitoring period, July 15 to August 5, the temperature on tiers A and H ranged from 78.26° to 92.66° F.[5] Meanwhile, the heat index ranged from 81.5° to 107.79° F. On five separate days the heat index on tier A surpassed 100° F. On tier H, the heat index surpassed 100° F on seven days.

After the data collection period, the district court held a three-day bench trial. Experts testified about the Plaintiffs' medical conditions, the conditions on death row, the design and construction of the facility, and the effectiveness of current practices and procedures. The judge personally toured the facility to observe the conditions first-hand. Several months later, the district court issued a 100-page ruling that concluded the conditions on death row are cruel and unusual because of extreme heat during parts of the year. The court denied the prisoners' ADA and RA claims because they are not disabled. Based on the constitutional violation, the court issued a permanent injunction, requiring the state to develop a plan to keep the heat index at or below 88° F. Effectively, the district court ordered Louisiana to install air conditioning. Both sides now appeal.

---

[5] USRM monitored the temperature on all the tiers. But because the Plaintiffs only reside on tiers A and H, and because this is not a class-action, only readings from those tiers are relevant to this appeal.

No. 14-30067

## DISCUSSION

The parties present four issues. The Defendants assert that the district court made several erroneous evidentiary rulings, wrongly found a constitutional violation, and issued an overbroad injunction contrary to the PLRA, 18 U.S.C. § 3626, and *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004). The inmates' cross-appeal contends that the district court used a superseded definition to determine whether they are disabled under the ADA and RA. We review the liability issues first, then the scope of the injunction.

### I. Evidence

The State's evidentiary objections are easily resolved. It contends that the heat index, on which the district court based its ruling, is inherently unreliable and inappropriate in prison settings. It also contends that the court should not have taken judicial notice of other facts without providing the State an opportunity to respond. The objections are meritless.

We review evidentiary rulings for abuse of discretion. *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 550 (5th Cir. 2000) (citing *Jon-T Chemicals, Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1417 (5th Cir. 1983)). Even if the court abused its discretion, this court will presume the error is harmless. *See* FED. R. CIV. P. 61; *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). The party asserting the error has the burden of proving that the error was prejudicial. *See Dietz v. Consol. Oil & Gas, Inc.*, 643 F.2d 1088, 1093 (5th Cir. 1981) (quoting *Liner v. J.B. Talley and Co., Inc.* 618 F.2d 327, 329 (5th Cir. 1980)).

The district court did not abuse its discretion by admitting evidence of or relying on the heat index. The thrust of the State's argument is that because heat index is a derived number, courts cannot use it as a basis for ruling. Although the State's expert meteorologist, Jay Grymes, testified that the heat index is "not a real number," the rest of his testimony bolsters the use of the

heat index. For example, Grymes testified that the heat index is a "guideline number" and that he "provide[s] heat index as a guide to [his] viewers to make better decisions." Dr. Susi Vassallo, the Plaintiffs' expert, testified that peer reviewed scientific articles measure the correlation between heat index and morbidity and mortality. This court also has relied on the heat index before. *See Gates*, 376 F.3d at 339 (upholding increased access to ice, water, and showers when the heat index exceeds 90° F.). In the absence of further proof, the court did not abuse its discretion.

The State's complaint about the court's taking judicial notice of publicly available evidence is similarly weak. The court cited an article from the National Weather Service's website called *Heat: A Major Killer* and referred to temperature readings from the Baton Rouge Regional Airport.

Because the district court did not warn the State that it would be taking judicial notice of these materials, the State complains it was "deprived of the opportunity to request an opportunity to be heard regarding the data." Rule 201, however, expressly contemplates courts' taking judicial notice without prior warning. *See* FED. R. EVID. 201(e) ("If the court takes judicial notice *before notifying a party*, the party, on request, is still entitled to be heard." (emphasis added)); 21B KENNETH W. GRAHAM, JR., FED. PRAC. & PROC. EVID. § 5109 (2d ed.) (Rule 201 does "not require any notice to the parties that judicial notice [is] about to be taken," and "a party might get no advance notice at all"). The State, moreover, did not avail itself of the Rule's provision requiring the court to provide an opportunity to be heard. *See* FED. R. EVID. 201(e); *See also* FED. R. CIV. P. 59(a)(2) ("After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."). In any event, the State's explanation of prejudice is vague, cursory and unpersuasive. It makes no showing that the

district court's consideration of the National Weather Service article or Baton Rouge temperature readings altered the outcome. *See Dietz*, 643 F.2d at 1093. The judicial notice objections fail as well as the heat index objection.

## II.     Eighth Amendment

Turning to the Plaintiffs' Eighth Amendment claims, the Constitution " 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*. 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392, 2400 (1981)). Extreme cell temperatures, therefore, can violate the Eighth Amendment. To be tantamount to the infliction of cruel and unusual punishment, prison conditions must pose "an unreasonable risk of serious damage" to a prisoner's health – an objective test – and prison officials must have acted with deliberate indifference to the risk posed—a subjective test. *Helling v. McKinney*, 509 U.S. 25, 33-35, 113 S. Ct. 2475, 2481-82 (1993) (holding exposure to an "unreasonable risk of damage to [a plaintiff's] health" actionable under the Eighth Amendment); *see also Wilson v. Seiter*, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327 (1991) (postulating that "a low cell temperature at night combined with a failure to issue blankets" can violate the Eighth Amendment); *Gates*, 376 F.3d at 339. Without the requisite proof of both subjective and objective components of an Eighth Amendment violation, however, merely "uncomfortable" heat in a prisoner's cell does not reflect "a basic human need that the prison has failed to meet" and is not constitutionally suspect. *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995).

The predicate findings of a substantial risk of serious harm and officials' deliberate indifference to the risk are factual findings reviewed for clear error. *Gates*, 376 F.3d at 333; *Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010) (citing *Farmer*, 511 U.S. at 842, 114 S. Ct. at 1981). " 'A finding is clearly erroneous if it is without substantial evidence to support it, the court

misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony.' " *Petrohawk Props., L.P. v. Chesapeake La., L .P.*, 689 F.3d 380, 388 (5th Cir. 2012) (quoting *French v. Allstate Indem. Co.*, 637 F.3d 571, 577 (5th Cir. 2011)).  This court reviews *de novo* whether the facts so found violate the Eighth Amendment. *Gates*, 376 F.3d. at 333.

For various reasons, the State asserts that the Plaintiffs are not at substantial risk of serious harm and its officials were not deliberately indifferent to this risk.  Further, the State contends that, because it provides the remedies this court mandated in *Gates*, there can be no Eighth Amendment violation as a matter of law.  We reject these challenges to the trial court's findings.

Based mainly on Dr. Vassallo's testimony, the district court found that the heat puts these plaintiffs at substantial risk of serious harm.  According to Dr. Vassallo, the cardiovascular system is critical for maintaining normal body temperature.  Dr. Vassallo testified that both hypertension and diabetes can adversely affect this critical system.  "The heart has to be able to pump very hard to meet the demands of heat."  Hypertension generally can decrease "the ability of the blood vessels to open and close."  As a result, those vessels are "not as compliant as they should be," "they can't open like they should and have to in response to heat," and blood therefore cannot circulate to cool the body. Therefore, people with hypertension generally can have a hard time controlling their body temperature.  The same is true for people with diabetes. Cardiovascular disease, which can result from diabetes, can harden the arteries and blood vessels, thus inhibiting circulation.  As a result, diabetics can lose ability to circulate blood properly and thus the ability to maintain normal body temperature.

The treatments for hypertension can further inhibit these prisoners' ability to regulate body temperature.  Specifically, beta blockers, which help control blood pressure, can compound the effects hypertension has on the cardiovascular system.  Beta blockers prevent blood vessels from dilating properly while at the same time "decreas[ing] the heart's ability to pump as hard and to meet the requirements of heat or exercise."  Likewise, diuretics decrease the total amount of water and salt in the body, resulting in less fluid around which the heart can contract.  According to Dr. Vassallo, without sufficient fluid to contract, the heart is unable to meet the increased demands heat places on the cardiovascular system.  Therefore, even if prisoners receive proper care for their ailments, they may be at increased risk of heat stroke.  This evidence of the Plaintiffs' heightened vulnerability to high temperatures, combined with the USRM temperature data showing the high temperatures on tiers A and H, led the court to find that the Plaintiffs are at substantial risk of serious harm.

The State argues that the totality of the record evidence refutes Dr. Vassallo's opinion.  Specifically, the district court discounted the State's arguments that no death-row prisoner has ever suffered a heat-related incident; these prisoners' medical records show no signs of heat-related illness; the prisoners' poor dietary choices and failure to exercise caused their health problems; and the prisoners' suffer high blood pressure all year, not just in the summer months.  Thus, the State contends, the prisoners do not suffer an unreasonable risk of serious heat-related injury at all.

These facts fail to show that the district court clearly erred.  First, that no one at Angola, including these plaintiffs, has ever had a heat-related incident and that these prisoner's medical records do not show signs of heat-related illness are insufficient.  To prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred.  *See*

*Helling*, 509 U.S. at 33, 113 S. Ct. at 2481 ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition."). They need only show that there is a "substantial risk of serious harm." *Gates*, 376 F.3d at 333. Further, Dr. Vassallo provided a reasonable explanation for the lack of past harm to these plaintiffs: "heat stroke is a failure of thermoregulation which is dramatic and catastrophic. It occurs suddenly . . . . People can suffer suddenly from heat stroke without ever having complained about the weather." As a result, the district court plausibly concluded that the Plaintiffs here are at a substantial risk of serious harm.[6]

Second, because the Plaintiffs forego exercise and overeat junk food, the State asserts that their ailments and any accompanying risk are their own creation. Prison canteen records confirm these inmates' consumption of unhealthy foods with high sugar and salt content. Although this may be true, the evidence is at best conjectural about the connection between these plaintiffs' conditions and their lifestyle. We are constrained to agree with the district court's finding that, canteen food comprises only part of the prisoners' diets, and their medical conditions arise from a combination of factors, many of which are outside their control. Thus, the district court did not clearly err when, in the face of conflicting evidence, it found that these prisoners are at substantial risk of serious harm.

Finally, that the prisoners suffer year-round high blood pressure is simply irrelevant to the district court's substantial-risk finding. The prisoners' complaint is that their high blood pressure places them at an abnormally high risk of heat stroke during Louisiana's extended hot season. The lower risk in other months does not offset their vulnerability during the summer any more

---

[6] We emphasize, however, that the finding of substantial risk regarding a heat-related injury is tied to the individual health conditions of these inmates.

than an allergy to insect bites ceases to exist when the bugs are dormant in winter.

The second element for Eighth Amendment liability requires "prison official[s] [to] have a 'sufficiently culpable state of mind.' " *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977 (quoting *Wilson*, 501 U.S. at 297, 111 S. Ct. at 2323). "In prison conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* (quoting *Wilson*, 501 U.S. at 302-303, 111 S. Ct. at 2326). Deliberate indifference is itself a two-prong inquiry. An official must both be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "he must also draw the inference." *Id.* at 837, 114 S. Ct. at 1979. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842, 114 S. Ct. at 1981 (internal citations and quotation marks omitted).

The district court relied on a variety of evidence showing that the State knew of and disregarded a substantial risk to the Plaintiffs. Medical personnel routinely monitor prisoners and administer medication daily. Correctional officers "closely monitor" the temperature on death row, recording the temperature every two hours. Defendant Norwood, moreover, testified that the prison maintains a list of, and monitors more closely, inmates particularly susceptible to heat-related illness. None of the Plaintiffs was on the list, although Norwood personally reviewed the ARPs for each prisoner, inspected each prisoner's medical records, interviewed both Ball and Code, and admits Magee should have been on the list. Defendant Cain admitted that he was always thinking about "how to overcome the heat" and that he considered adding extra fans and ice on the tiers. Most strikingly, after this suit was filed,

No. 14-30067

and during the court-ordered monitoring period the Defendants surreptitiously installed awnings and began soaking some of the tiers' exterior walls with water in an attempt to reduce the interior temperature. Their trick backfired. Based on these facts, the district court reasonably inferred that the Defendants knew of a substantial risk of serious harm to the Plaintiffs.

Yet the State complains that the deliberate indifference finding is fundamentally flawed because the district court relied solely on the prisoners' administrative remedy requests, which are required under the PLRA. *See* 42 U.S.C. § 1997e(a). If that is sufficient to prove deliberate indifference, the State continues, then there is no need for a court to separately analyze the deliberate indifference prong. As a statutory necessity, *see Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012), every case includes an administrative remedy request. Whenever a court finds that a prisoner's complaint was justified—*i.e.*, that there is a substantial risk of harm—the defendant will be guilty of violating the Eighth Amendment.

We agree with the Defendants' premise—a request for administrative relief cannot alone prove deliberate indifference. A request for administrative relief is at best only circumstantial evidence that a prison official is aware of facts from which he can deduce a risk of harm; it is not even particularly strong evidence of that. Because grievances are essentially pleadings, not evidence, they must have independent verification before they become probative. Separating the few meritorious complaints from the mountain of frivolous complaints is as difficult work for prison officials as for federal courts. A legitimate complaint can go unrecognized by even the most diligent official. As a result, a prison administrator who has received an administrative remedy request is not necessarily made aware, without factual corroboration, that there is a substantial risk of serious harm.

12

Although the State's premise is correct, its conclusion that the district court's deliberate indifference finding is erroneous does not follow. The district court did not base its finding solely on the prisoners' administrative requests, but on the totality of the record evidence. There is more than enough, particularly in light of the State's attempt to cool down the cells with awnings and misting without telling the court, to prove subjective awareness of a substantial risk of serious harm. Therefore, the district court's deliberate indifference finding is not clearly erroneous.

Even if it cannot overcome the district court's factual findings, the State argues that this court's decision in *Gates v. Cook* precludes liability. *Gates* upheld an injunction requiring Mississippi to equip each cell with fans, provide inmates with additional access to ice water, and allow daily showers when the heat index in the cells exceeded 90º F. 376 F.3d at 339. The State claims to offer these exact remedies year-round.

The district court, however, demonstrated that *Gates* is distinguishable. Where *Gates* approved fans for each cell, each fan in Angola's death row serves two cells. *Ball v. LeBlanc*, 988 F. Supp. 2d 639, 680 n.100 (M.D. La. 2013). Although a seemingly minor difference, the district court found that "the fans [at Angola] [do] not provide equal amounts of air flow to each cell, nor [do] the fans provide a detectable cooling effect." *Id.* The district court in *Gates* also ordered increased in-cell access to ice. 376 F.3d at 339. Here, by contrast, inmates have unfettered access to ice only during the one hour a day they can walk the tiers.[7] *Ball*, 988 F. Supp. 2d at 680 n.100. When the prisoners are in their cells, they depend on other inmates or guards for ice. *Id.* And while the State allows prisoners to shower once a day, as approved in *Gates*, the water

---

[7] Even then, obtaining ice is no guarantee. The record suggests that the ice machine occasionally breaks down leaving the tier ice chests empty.

13

No. 14-30067

temperature is maintained between 100 and 120º F. for sanitation purposes, thus providing little relief from the heat. *Id.* Given these material differences, *Gates* does not preclude holding that the State violated the Eighth Amendment.

Based on its findings of fact, we affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the Eighth Amendment.

### III. Disability Claims

The inmates assert that the State's failure to alleviate the heat violates their rights to a reasonable accommodation for their "disabilities" under the ADA and RA.[8] The district court rejected the prisoners' claims because they presented no *evidence* that they are disabled.[9] *Ball*, 988 F. Supp. 2d at 687. The prisoners argue that the district court's conclusion rests on an abbreviated definition of disability and superseded case law. Although the prisoners are correct, there is still no evidence that the prisoners are disabled under the correct definition, so any error was harmless.

We review the district court's conclusions of law *de novo*, and its factual findings for clear error. *Lightbourn v. Cnty. Of El Paso, Tex.*, 118 F.3d 421,

---

[8] On appeal, the prisoners also assert a disparate-impact claim. But the prisoners' complaint does not allege a disparate-impact claim and, as far as we can tell, this appeal is the first time the prisoners have asserted such a claim. "It is a bedrock principle of appellate review that claims raised for the first time on appeal will not be considered." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctr., Inc.*, 200 F.3d 307, 316-17 (5th Cir. 2000). Accordingly, we will not address the prisoners' disparate-impact claim.

[9] To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations. *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013). The ADA applies to

No. 14-30067

426 (5th Cir. 1997). If the district court made a legal error that affected its factual findings, "remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman-Standard v. Swint*, 456 U.S. 273, 292, 102 S. Ct. 1781, 1792 (1982); *see also Aransas Project v. Shaw*, 775 F.3d 641, 658 (5th Cir. 2014), *cert. denied*, No. 14-1138, 2015 WL 1255228, at *1 (June 22, 2015).

Under both the ADA and RA,[10] a person is disabled if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The statute defines a major life activity in two ways. First, major life activities include, but are not limited to:

> caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

*Id*. § 12102(2)(A). Second, a major life activity includes "the operation of a major bodily function." *Id*. § 12102(2)(B). Such functions include, but are not limited to:

> the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

*Id*. The prisoners can prove themselves disabled if their ailments substantially limit either a major life activity or the operation of a major bodily function.

The prisoners point out that the district court considered whether they are disabled only under the first definition of major life activities; it did not

---

prisoners. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213, 118 S. Ct. 1952, 1956 (1998). The district court found each prisoner failed to prove the first prong—*i.e.*, that they are disabled.

[10] The RA incorporates the ADA definition of disability by reference. *See* 29 U.S.C. § 705(20)(B). Accordingly, if the prisoners are disabled, they are disabled under both statutes.

15

consider whether their impairments affect a major bodily function. We agree. The district court quoted only the first definition of a disability, but it overlooked that "a major life activity also includes the operation of a major bodily function." *Id*. § 12102(2)(B). The district court also partially relied on *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197, 122 S. Ct. 681 (2002), which Congress superseded in the Americans with Disabilities Amendments Act of 2008 ("ADAAA"). *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013).

Although this error may have affected the district court's determination, the question remains whether any evidence supports the prisoners' disability claims. The prisoners argue that "thermoregulation" is a major life activity, there is ample evidence in the record showing their thermoregulatory functions are impaired, and therefore they are disabled.

Assuming *arguendo* that thermoregulation is a major life activity,[11] there is no *evidence* that these prisoners' thermoregulatory systems are actually impaired. According to Dr. Vassallo, thermoregulation is "the capacity of the body to maintain the temperature of 98.6 within half a degree or so." There is no evidence that the prisoners' ailments have ever caused their body temperatures to rise above 98.6º F. In fact, Dr. Vassallo testified that the prisoners' symptoms are consistent with normal body temperatures, there is no indication that these prisoners have ever had elevated body temperatures,

---

[11] The prisoners urge this court to hold that thermoregulation is a major bodily function (and thus a major life activity) because the ADA's list is non-exhaustive. *See* 42 U.S.C. § 12102(2)(B). Before the passage of the ADAAA, this court left undecided whether "the regulation of body temperature constitutes a major life activity under the ADA." *EEOC v. Argo Distribution, LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009). Post-ADAAA, no court has held that thermoregulation is a major bodily function, nor do EEOC regulations list thermoregulation as a major bodily function. 29 C.F.R. § 1630.2(i)(1)(ii). Accordingly, we take the cautious route and assume without deciding that thermoregulation is a major life activity.

and there is no evidence that these prisoners ever experienced difficulty in thermoregulating.

That the record is devoid of such evidence is unsurprising. Over the course of the three-day trial, there is hardly any mention of the prisoners' disability claims. The overwhelming majority of the testimony related to the future risk of heatstroke, not the prisoners' present inability to maintain regular body temperature. As a result, the medical testimony focused generally on the risks to individuals with the same ailments as these prisoners, not on any limitations the prisoners presently experience. The prisoners' counsel, moreover, never asked the three medical experts whether the prisoners' thermoregulatory systems are *actually* impaired, probably because evidence in the record precludes any such assertion. This lapse is fatal to their disability claims. As this court has said before, although the current definition of disability "expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination." *Neely*, 735 F.3d at 245.[12] The disability claims are insupportable as a matter of law even under the expanded legal definition of disability.

---

[12] Ball also argues that he is disabled because diabetes impairs his endocrine system and his sight. Although this might be true, that Ball's endocrine system and sight are impaired does not entitle him to relief from the *heat*. Only if Ball's diabetes limits his ability to thermoregulate, can Ball get the only relief he requested—an order requiring Louisiana to keep the prison at or below 88 degrees. As for that claim—that Ball's diabetes impairs thermoregulation—there is no evidence in the record.

No. 14-30067

IV.    The Injunction

To remedy the Eighth Amendment violation, the district court ordered Louisiana to "develop a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit." *Ball*, 988 F. Supp. 2d at 689. Effectively, the plan requires the State to install air conditioning throughout death row housing. The State attacks the district court's order in two ways. First, it contends that the requirements for injunctive relief are not present here. Second, it argues that the injunction is overbroad because air conditioning is beyond the measures endorsed in *Gates v. Cook* and facility-wide relief violates the PLRA.

This court reviews permanent injunctions for abuse of discretion. *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th Cir. 2014) (citing *N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916-17 (5th Cir. 1996)). An abuse of discretion occurs when the district court " '(1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction[,] (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.' " *Id.* (quoting *N. Alamo Water Supply Corp.*, 90 F.3d at 916-17).

The court did not abuse its discretion by deciding to issue an injunction. The State's first argument is that an injunction is improper because conditions to which these prisoners were subjected do not violate the Eighth Amendment. This contention fails in light of our sustaining the district court's Eighth Amendment analysis. Moreover, in *Gates* as in other cases, courts have upheld injunctions in Eighth Amendment cases alleging unreasonably risky exposure to extreme temperatures. *See Graves v. Arpaio*, 623 F.3d 1043, 1045 (9th Cir. 2010) (per curiam) (leaving an injunction in place requiring a prison to keep inmates on certain medications in cells with temperatures below 85 degrees);

18

*Jones-El v. Berge*, 374 F.3d 541, 542 (7th Cir. 2004) (upholding order to install air conditioning in Wisconsin's "supermax" prison).

The scope of the injunction is another matter. The PLRA greatly limits a court's ability to fashion injunctive relief. Before a district court can award such relief, it must find that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A). The court must also "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.* If, after making the necessary findings and weighing the adverse impact on the criminal justice system, the court still feels injunctive relief is required, such relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." *Id.*

The district court's injunction violates the PLRA in two ways. First, the district court ordered a type of relief—air conditioning—that is unnecessary to correct the Eighth Amendment violation. Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury. *See Westefer v. Neal*, 682 F.3d 679, 683-84 (7th Cir. 2012) (vacating an injunction under the PLRA because it exceeded what was required under the Due Process Clause). In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable. Here Plaintiffs' own expert, Dr. Vassallo, explained that there are many acceptable remedies short of facility-wide air conditioning. For example, the Defendants could divert cool air from the guards' pod into the tiers; allow inmates to access air conditioned areas during their tier time; allow access to cool showers at least once a day; provide ample supply of cold drinking water and ice at all times; supply personal ice containers and individual fans;

and install additional ice machines. These are precisely the types of remedies this court endorsed in *Gates v. Cook* and that the PLRA requires. *See* 376 F.3d at 339-40. Accordingly, on remand the district court must limit its relief to these types of remedies.

The district court also erred because it awarded relief facility-wide, instead of limiting such relief to Ball, Code, and Magee. The district court apparently understood that it could not order facility-wide relief. At the start of trial, the district court said:

> This is not, contrary to widespread belief, an effort to require the state to install air-conditioning for all of the tiers that house all death row inmates. I think the application for injunctive relief made clear that it's only these three inmates that are of issue. And so, of course, the evidence in this case will pertain to any facts that are relevant as to these three . . . . plaintiffs and these three plaintiffs only. This is not a class action lawsuit. This is not, again, an effort to seek relief for anyone other than these three inmates.

It is unclear why the district court changed its mind when it fashioned the injunction. The PLRA limits relief to the particular plaintiffs before the court. 18 U.S.C. § 3626(a)(1)(A). This is not a class action; Ball, Code, and Magee are the only plaintiffs before the court. As a result, any relief must apply only to them, if possible. *Brown v. Plata*, --- U.S. ---, 131 S. Ct. 1910, 1940 (2011) (holding that "the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court"); *Gates*, 376 F.3d at 339 (vacating an injunction that purportedly applied to prisoners outside the class of plaintiffs because "it exceeds the scope of the litigation"); *see also Graves*, 623 F.3d at 1049-50 & n.2 (noting that if the district court can limit relief to an affected class-member, it must do so under the PLRA).

Nevertheless, the district court ordered relief to all 85 death-row inmates because "the Defendants may move any death row inmate to a different tier and/or cell at any time." *Ball*, 988 F. Supp. 2d at 688-89. Essentially, it felt the only way to provide effective relief to these three plaintiffs is to provide facility-wide relief. The district court's determination, however, is erroneous. Even assuming that air conditioning is an acceptable remedy here—and it is not—it is possible to provide air conditioning solely to these three inmates. As the Defendants acknowledged at oral argument, Plaintiffs could be placed in cells next to the officers' pod, which are cooler than those farther down the tiers. Louisiana could also air condition one of the four tiers for the benefit of prisoners susceptible to heat-related illness. When coupled with an order not to move the Plaintiffs from these cells unless certain conditions are met, these options could adequately remedy the Plaintiffs' constitutional violation. Moreover, the *Gates*-type remedies available on remand—increased access to water, ice, cold showers, etc.—ought to (and must) be tailored to these three prisoners.

Because the district court's injunction provides an unnecessary type of relief and applies beyond these three Plaintiffs, it violates the PLRA. Accordingly, the district court abused its discretion.

Finally, we note the substantial disparity between the relief ordered in *Gates* and the scope of the injunction in this case. The *Gates* court did not mandate a maximum heat index applicable in the Mississippi prison. It required particular heat measures, including fans, ice water, ice, and showers, "if the heat index reaches 90 degrees or above." *Gates*, 376 F.3d at 336. The injunction here requires relief that is far more extensive, applies even during months when there is no heat risk to the Plaintiffs, covers the entire facility, and of course is expensive. Since *Gates* upheld an injunction providing narrower relief, and there is no showing that the Constitution mandated more

No. 14-30067

relief for these prisoners for the same prison condition in this case, on remand the court must craft relief more closely aligned with *Gates* as well as consistent with the PLRA.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's resolution of the Eighth Amendment and disability claims, but **VACATE** and **REMAND** the district court's injunction for reconsideration under the principles stated here.

No. 14-30067

REAVLEY, Circuit Judge, dissenting.

I agree with almost all of the opinion, but I would affirm the injunction which in principal only orders the heat index in the Angola death row tiers to be maintained below 88 degrees.