11/17/2020 9:55:12 AM

# Compare Results

| Old File: | | New File: |
|---|---|---|
| **20A70.pdf** | versus | **20A70_new.pdf** |
| **11 pages (130 KB)** | | **11 pages (146 KB)** |
| 11/16/2020 12:31:32 PM | | 11/17/2020 9:53:53 AM |

**Total Changes**

# 18

**Content**

14 Replacements

1 Insertion

1 Deletion

**Styling and Annotations**

0 Styling

2 Annotations

Go to First Change (page 7)

# SUPREME COURT OF THE UNITED STATES

———————

No. 20A70

———————

## LADDY CURTIS VALENTINE, ET AL. *v.* BRYAN COLLIER, EXECUTIVE DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, ET AL.

ON APPLICATION TO VACATE STAY

[November 16, 2020]

The application to vacate stay presented to JUSTICE ALITO and by him referred to the Court is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, dissenting from the denial of application to vacate stay.

I write again about the Wallace Pack Unit (Pack Unit), a geriatric prison in southeast Texas that has been ravaged by COVID–19. See *Valentine* v. *Collier*, 590 U. S. ___ (2020) (statement respecting denial of application to vacate stay). The Pack Unit is a "'tinderbox'" for COVID–19, not only because it is a dormitory-style facility, "making social distancing in the living quarters impossible," but also because the vast majority of its inmates are at least 65 years old, and many suffer from chronic health conditions and disabilities. *Valentine* v. *Collier*, 455 F. Supp. 3d 308, 322, 325 (SD Tex. 2020). These inmates are some of the most vulnerable in the country to the current pandemic.

COVID–19 was first detected in the Pack Unit in April 2020, after one inmate, Leonard Clerkly, contracted the virus and died. *Id.,* at 312. Since then, over 500 inmates have tested positive (more than 40% of the inmate population), and 19 more have died. See 2020 WL 5797881, *7, *29 (SD Tex., Sept. 29, 2020). The Pack Unit's 20 deaths account for 12% of all confirmed and presumed deaths from

COVID–19 in the entire Texas Department of Criminal Justice (TDCJ) prison system. See Tex. Dept. of Criminal Justice, COVID–19 Dashboard, https://www.tdcj.texas.gov/covid-19/mac_dashboard.html.

In July, the District Court held a weeks-long trial that revealed rampant failures by the prison to protect its inmates from COVID–19. In September, the District Court entered a permanent injunction requiring prison officials to implement basic safety procedures. The Fifth Circuit, however, stayed the injunction pending appeal. Now, two inmates, Laddy Valentine and Richard King, ask this Court to vacate the stay. Because they have met their burden to justify such relief, I would grant the application.

I

Valentine and King are 69 and 73 years old, respectively. 2020 WL 5797881, *2. Already in a high-risk category due to their ages, both suffer from multiple health conditions that increase the likelihood of serious illness and death from COVID–19, including diabetes, hypertension, and kidney disease. *Ibid.* Earlier this year, Valentine and King sued the senior warden of the Pack Unit (Robert Herrera), the executive director of the TDCJ (Bryan Collier), and the TDCJ on behalf of a class of fellow inmates, alleging that prison officials were violating the inmates' Eighth Amendment rights by failing to protect them adequately from COVID–19.[1]

Following an 18-day trial, the District Court made detailed findings of fact about the officials' "consistent noncompliance with basic public health protocols" and failure "to take obvious precautionary public health measures upon which all medical professionals would agree." *Id.,* at

_____

[1] The inmates also raised claims under the Americans with Disabilities Act (ADA). Because the Eighth Amendment claims provide a sufficient basis to grant the requested relief, I do not address the ADA claims.

SOTOMAYOR, J., dissenting

*32. The District Court's findings covered the gamut of essential precautions, including social distancing, mask wearing, proper cleaning and sanitization, testing, quarantining, and contact tracing. Prison staff, for example, regularly failed to wear masks, as documented in the prison's own educational video about COVID–19. *Id.,* at *16. The prison's communal showers were not cleaned between uses by different dorms, and disabled inmates had to sit shoulder to shoulder on benches while waiting for a disability-accessible shower to become available. *Id.,* at *10, *15. Inmates were responsible for cleaning the dorms during the outbreak, with no additional staffing, training, or cleaning supplies. *Id.,* at *13. This requirement was especially difficult for Harold Dove, who is wheelchair-bound, legally blind, and paralyzed on the right side of his body. *Id.,* at *14. He and others repeatedly notified the prison that he was physically unable to clean his assigned dorm, but officials continued to assign him cleaning duties for months, at the height of the outbreak. *Ibid.* One of the wardens later testified that he was not concerned about assigning cleaning duties to disabled inmates because a disabled inmate "'could put a broom against his neck and push it with a wheelchair.'" *Ibid.*

Based on the extensive trial record, the District Court entered a permanent injunction requiring the prison to establish and implement minimum safety protocols. These include "regular cleaning of common surfaces," "unrestricted access to hand soap," "wearing of [personal protective equipment (PPE)] among TDCJ staff," weekly testing, contact tracing, and quarantining inmates who are awaiting test results. *Id.,* at *37–*38. Some of these procedures are already required by statewide policy. See Electronic Case Filing in No. 4:20–cv–1115, Doc. 94–4 (SD Tex., May 13, 2020) (ECF).

The Fifth Circuit stayed the injunction pending appeal, concluding that respondents were likely to prevail because

the inmates failed, before filing suit, to seek relief through the prison's internal grievance process, as required by the Prison Litigation Reform Act (PLRA). See 978 F. 3d 154, 162 (CA5 2020). In the Fifth Circuit's view, it was "irrelevant" if that grievance process was "ineffective" or "'operated too slowly'" in light of the ongoing outbreak. *Ibid.* The court also concluded, notwithstanding the District Court's finding of systematic "shortcomings" at the Pack Unit, that the inmates' claims would likely fail on the merits because the prison's "actions were reasonable." *Id.,* at 163–164. Finally, the Fifth Circuit determined that, absent a stay, the injunction would irreparably harm prison officials by interfering with their ability to manage the Pack Unit, and that the public interest favored a stay. *Id.,* at 165–166. This application followed.

## II

The bar for vacating a stay is high. Among other things, the decision at issue must be "demonstrably wrong." *Western Airlines, Inc.* v. *Teamsters,* 480 U. S. 1301, 1305 (1987) (O'Connor, J., in chambers). When this Court ruled on the prior application in this case, challenging the Fifth Circuit's stay of the preliminary injunction, the limited evidentiary record made it difficult to conclude that this stringent standard was met. Now, with the benefit of the District Court's detailed factfinding, no such difficulty remains. The Fifth Circuit demonstrably erred with respect to both the threshold issue of exhaustion under the PLRA and the merits of the inmates' Eighth Amendment claims.

## A

Under the PLRA, inmates seeking to bring federal claims concerning prison conditions must first exhaust "available" administrative remedies. 42 U. S. C. §1997e(a). In *Ross* v. *Blake,* 578 U. S. 632 (2016), this Court held that remedies are not available, and thus exhaustion is not required,

when "an administrative procedure . . . operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*., at 643. In other words, even if an internal process is "officially on the books," it is not "'available'" if, as a practical matter, it "is not capable of use to obtain relief." *Ibid.*

That was the case here, as the District Court found. 2020 WL 5797881, *28. The prison's grievance process is lengthy, beginning with mandatory informal dispute resolution and followed by up to 160 days of formal review. *Id., at *22. Remarkably, when this suit was filed, "COVID-related grievances were not treated differently from other types of grievances," despite inmates' attempts to designate them as emergencies. *Ibid.* Both Valentine and King filed grievances that remained pending for over two months during the outbreak. *Id., at *27. By respondent Collier's own admission, the prison's policy "'did not give adequate attention to the COVID–19 issue.'" 2020 WL 3491999, *6 (SD Tex., June 27, 2020).

Given the speed at which the contagion spread, the 160-day grievance process offered no realistic prospect of relief. In just 116 days, nearly 500 inmates contracted COVID–19, leading to 74 hospitalizations and 19 deaths. 2020 WL 5797881, *7. At least one inmate, Alvin Norris, died before the prison took any steps in response to his grievance. *Id., at *28. Both Valentine and another inmate, Gary Butaud, contracted COVID–19 while their grievances remained pending. *Id., at *23.

The Fifth Circuit erred as a matter of law when it disregarded these findings by the District Court. The Fifth Circuit seized on language in *Ross* rejecting a judicially created exception to exhaustion for "'special circumstances,'" and concluded that "special circumstances—even threats posed by global pandemics—do not matter." 978 F. 3d, at 161 (citing 578 U. S., at 639). But the special-circumstances exception rejected in *Ross* applied when inmates failed to exhaust

available remedies. See 578 U. S., at 637. In rejecting such an exception, this Court nonetheless recognized that the PLRA "contains its own, textual exception to mandatory exhaustion" that applies when remedies are not "available." *Id.,* at 642. Contrary to the Fifth Circuit's analysis, consideration of "the real-world workings of prison grievance systems" is central to assessing whether a process makes administrative remedies available. *Id.,* at 643. When this suit was filed, the Pack Unit's process plainly did not. As the District Court put it, the PLRA "cannot be understood as prohibiting judicial relief while inmates are dying." 2020 WL 5797881, *37, n. 13.

B

The Fifth Circuit's evaluation of the merits of the inmates' claims was also demonstrably wrong. To prove an Eighth Amendment claim for unconstitutional prison conditions, an inmate must show that he was exposed to an objective risk of serious harm and that prison officials subjectively acted with deliberate indifference to inmate health or safety. *Farmer* v. *Brennan*, 511 U. S. 825, 834 (1994). Deliberate indifference is a "state of mind" equivalent to "recklessly disregarding" a known and substantial risk. *Id.,* at 835–836. Prison officials thus may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering." *Helling* v. *McKinney*, 509 U. S. 25, 33 (1993).

Here, the dangers of COVID–19 to these especially vulnerable inmates were undisputed and, indeed, "indisputable." 2020 WL 5797881, *30. The District Court first found that respondents were subjectively aware of those risks because they were obvious. *Ibid.* (citing *Farmer*, 511 U. S., at 842). Then, weighing the evidence and "competing narratives" presented by the parties at trial, the court concluded that the officials' conduct, communications, and omissions reflected deliberate indifference. 2020 WL 5797881,*30–

*31.

Each of these factual findings must be reviewed deferentially under the clear-error standard. See *Glossip* v. *Gross*, 576 U. S. 863, 881 (2015); *Ball* v. *LeBlanc*, 792 F. 3d 584, 592 (CA5 2015). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson* v. *Bessemer City*, 470 U. S. 564, 574 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that . . . it would have weighed the evidence differently." *Id.,* at 573–574.

Here, the District Court's assessment of the evidence was not only permissible, but fully supported. The District Court cited specific evidence that respondents knew not only of the dangers of COVID–19, but also of the dangers specifically created by their inadequate response to the outbreak. For example, respondent Collier received a text message on April 26, 2020, informing him of the dangers of the prison's policy of removing infected inmates from quarantine after 14 days, without confirming a negative test first: "FYI One of our first positives is still testing positive and shedding virus at 21 days. The state['s] 14 day isolation with no retesting is questionable at best." 2020 WL 5797881, *20. Yet inmates who had contracted COVID–19 testified that, following the 14-day period, they were "neither medically examined by a doctor [n]or retested for COVID–19 before returning to negative dorms." *Ibid.* One inmate, Roger Beal, informed medical and security staff that he should not be transferred after his 14-day period ended because he was still symptomatic; he even filed a formal grievance warning that he posed a risk to other inmates. *Ibid.* Nonetheless, Beal was transferred to a dorm for uninfected inmates after the minimum quarantine period ended, despite his continuing symptoms. *Ibid.*

Rather than contending with these facts, the Fifth Circuit

sidestepped the clear-error standard by claiming that its review was not "fact-specific." 978 F. 3d, at 165. But the Fifth Circuit's analysis makes clear that it substituted its own view of the facts for that of the District Court. For instance, in highlighting the prison's policy requiring masks and social distancing, the Fifth Circuit chose to ignore the District Court's express finding that "staff non-compliance with regard to wearing PPE and social distancing were regular, daily features of life in the Pack Unit." 2020 WL 5797881, *32. Similarly, the Fifth Circuit gave special weight to the prison's testing efforts, while disregarding the critical flaws identified by the District Court. To start, no mass testing occurred until about a month after the prison's first casualty. *Ibid.* Even then, inmates had to wait one to two weeks to get their results, which, according to the prison's own experts, was "simply too long to effectively contain the spread of the virus." *Id.,* at *33. Respondents knew of tests with shorter turnaround times but never explored the possibility of using them. *Ibid.* Perhaps most troublingly, the prison continued to house inmates diagnosed with COVID–19 together with inmates who tested negative—a failure that respondents obscured by "misrepresent[ing] certain facts" to the District Court. *Id.,* at *6, *20. In short, far from "dispell[ing]" an inference of deliberate indifference, the prison's actions highlighted by the Fifth Circuit only confirm it. See 978 F. 3d, at 164.

At bottom, the Fifth Circuit rejected the District Court's careful analysis of subjective deliberate indifference based on the Fifth Circuit's view that respondents took reasonable "affirmative steps" to respond to the virus. *Ibid.* But merely taking affirmative steps is not sufficient when officials know that those steps are sorely inadequate and leave inmates exposed to substantial risks. That was the case here: The District Court found that respondents "were well aware of the shortcomings" in their response "and never-

theless chose to stay the course, even after a number of inmates died." 2020 WL 5797881, *32. Respondent Collier even admitted that prison officials "'were not doing everything [they] should have been. . . . Thin[g]s like restricting, isolating, PPE access, cleaning supplies.'" *Id.,* at *21. To be sure, the "Eighth Amendment does not mandate perfect implementation," 978 F. 3d, at 165, but it also does not set a bar so low that any response by officials will satisfy it. Given the evidence in the record, there is no basis to overturn the District Court's finding of deliberate indifference.

## III

The Fifth Circuit's decision creates a risk of serious and irreparable harm to the inmates that far outweighs any risk of harm to respondents. See *Western Airlines,* 480 U. S., at 1305. The Fifth Circuit concluded that "a stay will not substantially harm" the inmates because the number of positive cases in the Pack Unit "has been drastically reduced." 978 F. 3d, at 166. It is true that, after a months-long outbreak that claimed 20 lives and infected over 40% of the Pack Unit's inmate population, the number of active positive cases has fallen. But the threat of a second outbreak is "ongoing." 2020 WL 5797881, *35. On the same day that respondents represented to this Court that active cases had reached zero, the prison reported three active cases among prison employees and one among inmates. See Reply Brief 2.

As the last outbreak demonstrated, COVID–19 can overtake a prison in a matter of weeks. On May 9, the Pack Unit reported 8 positive cases; in less than three weeks, there were over 200 cases, 5 deaths, and 12 hospitalizations. See 2020 WL 5797881,*7. Oral argument before the Fifth Circuit is weeks away, with a decision on the merits even further. If the injunction's safety measures are not implemented and maintained, this "relentless pandemic"

may again engulf the Pack Unit. *Id.,* at *36.

On the other hand, respondents make only a generalized claim that the injunction interferes with their ability to manage the Pack Unit. They fail to explain how any particular measure does so. See Brief in Opposition 27–29.[2] The permanent injunction imposes only basic safety measures using reasonable, flexible terms, such as the "regular cleaning of common surfaces with bleach-based cleaning agents," the "wearing of PPE among TDCJ staff," "weekly testing," and "contact tracing." 2020 WL 5797881, *37–*38. Respondents have admitted that some of these measures are "medically necessary" and required by statewide policy, and they claim that they have voluntarily implemented nearly all of them.[3] *Id.,* at *16, *19, *36; Brief

──────────

[2] In addressing the merits of the inmates' ADA claims, respondents argue that they cannot comply with the permanent injunction's requirement that mobility-impaired inmates be given access to hand sanitizer. See 2020 WL 5797881, *37. Hand sanitizer is an essential alternative to handwashing for these inmates because "[i]n traveling to and from the sink to wash their hands with soap and water, wheelchair-bound inmates must touch the tires of their wheelchairs, which may track dirt, urine, fecal matter, or germs from the floor." *Id.,* at *12. Respondents claim that hand sanitizer cannot be safely provided to these inmates because of the risk of "'misuse.'" Brief in Opposition 26. But "TDCJ did not perform an analysis to determine whether hand sanitizer could be provided to wheelchair-bound inmates at Pack Unit." 2020 WL 5797881, *12. At least one other TDCJ facility has found a safe way for inmates to handle hand sanitizer, even requiring them to rebottle it for use by TDCJ staff. *Id.,* at *13. Respondent Collier himself stated, "[I]f we need to [provide hand sanitizer to inmates] we know we can figure it out." *Ibid.* Respondents simply chose not to.

[3] Respondents' claim of compliance with the injunction underscores how feasible and modest its measures are. Their claim does not, however, make the injunction unnecessary. See Brief in Opposition 28. Like the District Court, I do "not have confidence that, without an injunction in place, TDCJ will continue to carry out policies that are appropriate to safeguard inmates' health and safety." 2020 WL 5797881, *35. They previously claimed that they had substantially complied with the terms of the preliminary injunction, only for the truth to be exposed at trial. See 960 F. 3d 707 (CA5 2020) (*per curiam*). If respondents truly intend

in Opposition 28. Respondents also presented no evidence of "budgetary or financial concerns" with the measures required by the injunction. 2020 WL 5797881, *36. They therefore fail to demonstrate that they will suffer any harm from the injunction. If circumstances change and respondents are able to show that a modification of the injunction is warranted, the District Court has offered to hear any such motion on 24 hours' notice. See ECF Doc. 422, p. 2.

*　*　*

The people incarcerated in the Pack Unit are some of our most vulnerable citizens. They face severe risks of serious illness and death from COVID–19, but are unable to take even the most basic precautions against the virus on their own. If the prison fails to enforce social distancing and mask wearing, perform regular testing, and take other essential steps, the inmates can do nothing but wait for the virus to take its toll. Twenty lives have been lost already. I fear the stay will lead to further, needless suffering.

Importantly, nothing in the Court's decision today prevents Valentine and King from returning to this Court if it becomes clear that the risks they face as a result of respondents' conduct are even graver than they already appear. Because I would not force them to wait until it may be too late, I respectfully dissent.

––––––––––

to remain in compliance with the permanent injunction, it is unclear why they are fighting so hard to overturn it.