**Elzie BALL; Nathaniel Code; James Magee, Plaintiffs–Appellees,**

**v.**

**James M. LEBLANC, Secretary, Department of Public Safety and Corrections; Darrel Vannoy, Warden, Louisiana State Penitentiary; Louisiana Department of Public Safety and Corrections; Warden James Cruz, Defendants–Appellants.**

No. 17-30052

United States Court of Appeals, Fifth Circuit.

Filed January 31, 2018

Mercedes Hardy Montagnes, Promise of Justice Initiative, New Orleans, LA, Nilay U. Vora, Jeffer Mangels Butler & Mitchell, L.L.P., Los Angeles, CA, for Plaintiffs-Appellees.

Colin Andrew Clark, Esq., Elizabeth Baker Murrill, Esq., Winston Eric White,

Assistant Attorney Generals, Office of the Attorney General for the State of Louisiana, Jeffrey K. Cody, Esq., Mary E. Roper, Esq., Shows, Cali & Walsh, L.L.P., Baton Rouge, LA, for Defendants-Appellants.

Before SMITH, BARKSDALE, and HIGGINSON, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Elzie Ball, Nathaniel Code, and James Magee are death row inmates in the Louisiana State Penitentiary ("LSP") and are housed in cells without air conditioning. The three sued in 2013, claiming a violation of the Eighth Amendment. Their case comes to us for the second time, after a different panel found that an Eighth Amendment violation had occurred and that injunctive relief was appropriate but that the district court had exceeded the bounds of the Prison Litigation Reform Act ("PLRA") and *Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004), by mandating facility-wide air conditioning and setting a maximum heat index. *See Ball v. LeBlanc*, 792 F.3d 584, 596, 598–600 (5th Cir. 2015) (*"Ball I"*). Because the district court did not adhere to the mandate, we reverse and remand.

I.

A.

The basis of the complaint is that plaintiffs have pre-existing medical conditions that render them vulnerable to heat-related injury. A detailed description of the death-row facility, located in Angola, Louisiana, can be found in *Ball I*, *id.* at 589–91. Most relevant here, the cells are without air conditioning, which has resulted in heat indices of over 100 degrees. Moreover, before suing, plaintiffs had only limited access to ice and could take only hot showers. The *Ball I* panel agreed with the finding of a constitutional violation: "[W]e affirm the district court's conclusion that housing these prisoners in very hot cells without sufficient access to heat-relief measures, while knowing that each suffers from conditions that render him extremely vulnerable to serious heat-related injury, violates the Eighth Amendment." *Id.* at 596.

The *Ball I* panel also concluded, however, that the initial injunction (the "First Plan") violated the PLRA. *Id.* at 598–600. Under the First Plan, the court effectively required the state "to install air conditioning throughout death row housing" by developing "a plan to reduce and maintain the heat index in the Angola death row tiers at or below 88 degrees Fahrenheit." *Id.* at 598 (quoting *Ball v. LeBlanc*, 988 F.Supp.2d 639, 698 (M.D. La. 2013) ). "The PLRA greatly limits a court's ability to fashion injunctive relief." *Id.* Courts may order only relief that "extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." *Id.* (quoting 18 U.S.C. § 3626(a)(1)(A) ).

Accordingly, the First Plan violated the PLRA, in part [1] because air conditioning was "unnecessary to correct the Eighth Amendment violation." *Id.* at 599.[2] The

---

[1] The panel also reasoned that the First Plan violated the PLRA by requiring facility-wide relief, which ran counter to the PLRA's requirement that relief be limited to the particular plaintiffs. *Ball I*, 792 F.3d at 599–600; 18 U.S.C. § 3626(a)(1)(A). On remand, the district court manifestly adhered to that part of

the mandate, which is not at issue in this appeal.

[2] In *Ball I*, this court closed the door to air conditioning as a permissible remedy here: "[A]ssuming that air conditioning is an acceptable remedy—and it is not," the panel reasoned that any relief must be limited to the

panel suggested "acceptable remedies short of facility-wide air conditioning," such as (1) diverting "cool air from the guards' pod into the tiers," (2) allowing access to air conditioned areas during tier time, (3) allowing "access to cool showers at least once a day," (4) giving "ample" cold drinking water and ice "at all times," (5) providing "personal ice containers and individual fans," and (6) installing "additional ice machines." *Id.* The panel told the district court to "limit its relief to these types of remedies." *Id.*

Additionally, the relief required under the First Plan was far broader than that approved of in *Gates. Id.* at 600. "The *Gates* court did not mandate a maximum heat index.... It required particular heat measures, including fans, ice water, and showers, 'if the heat index reaches 90 degrees or above.'" *Id.* (quoting *Gates*, 376 F.3d at 336). The panel noted that the First Plan required relief that was far more extensive and expensive than what *Gates* allowed and that because "*Gates* upheld an injunction providing narrower relief, and there is no showing that the Constitution mandated more relief for these prisoners for the same prison condition in this case, on remand the court must craft relief more closely aligned with *Gates* as well as consistent with the PLRA." *Id.*

### B.

On remand, the district court ordered the state to submit a new plan in light of this court's mandate, whereupon the state

submitted its " 'Second Heat Remediation Plan' or 'Second Plan.' " That plan provided that plaintiffs would have cold water for their daily, fifteen-minute showers; it gave each plaintiff ice containers that would be regularly replenished from newly purchased ice machines; and it provided each plaintiff with a personal fan. Unsatisfied, plaintiffs moved to modify, urging the court to reinstate its initial plan—*i.e.*, the very plan that *Ball I* had explicitly rejected.

In connection with simultaneous settlement discussions, the state implemented additional, experimental relief measures, consistent with the stipulation that "any discussions or actions taken would not be admissible as evidence in this case pursuant to ... Federal Rule of Evidence 408(a)(2)." These exploratory remedies, which the court termed the "Third Plan," are the basis for the later additional relief mandated by the modified second injunction at issue on this appeal. Moreover, the Special Master informed the parties that the district court had "advised that the implementation of any efforts or measures, on a trial basis, in this case will not be viewed as spoliation or destruction of evidence.... [T]hese discussions are confidential and will remain so as long as the parties so request."

The court then held two hearings. At the first, it heard evidence from Dr. Vassallo, who had testified in the initial trial and substantially reiterated her testimony. Additionally, each of the plaintiffs testified

---

particular plaintiffs in this case. *Ball I*, 792 F.3d at 600. Plaintiffs posit, however, that *Yates v. Collier*, 868 F.3d 354, 370–71 & n.8 (5th Cir. 2017), leaves open the possibility of mandated air conditioning. *Yates* interpreted *Ball I* as holding "that air-conditioning was not appropriate in that case because other acceptable and less-intrusive remedies had yet to be tried." *Id.* at 370. That observation on *Ball I* has no bearing on the task before us,

which is to interpret and enforce the mandate issued by a panel in this very case. Moreover, the only relevant *holding* in *Yates* regards class certification, an issue not present here. In any event, *Ball I* plainly says that air conditioning is "not" "an acceptable remedy" and was "unnecessary to correct the Eighth Amendment violation." *Ball I*, 792 F.3d at 599–600.

that, even after the implementation of the Second Plan, they experienced the same heat-related symptoms as before. At the second hearing, the Special Master testified about the Third Plan. Although the state objected that such evidence was inadmissible under Federal Rule of Evidence 408, the district court reasoned that it would not require disclosure of "any communications among the parties" but that it had to learn about the changes in plaintiffs' conditions of confinement, which relate to a constitutional violation. Accordingly, the court overruled the objection and admitted evidence of the Third Plan.

The court issued an injunction in accordance with the Third Plan, reasoning that the Second Plan did not reduce the substantial risk of serious harm because the plaintiffs continued to experience heat-related symptoms even during its implementation. *Ball*, 223 F.Supp.3d at 529, 545, 554–57. The court believed that "the *only* means to reduce the substantial risk of serious harm to Plaintiffs, and thereby remedy the Eighth Amendment violation in this case, is to lower the temperatures and heat indices to which Plaintiffs are exposed." *Id.* at 545.

Accordingly, the district court imposed the Third Plan, which contained the same requirements as the Second Plan but also required the state to (1) relocate plaintiffs to another tier, close to the guards' pod, (2) install an air vent in the guards' pod to divert cool air to plaintiffs' cells, (3) set up a plastic curtain around plaintiffs' cells to trap the cool air, (4) provide each plaintiff with an "IcyBreeze" unit, which is essentially an ice chest that blows cold air, and (5) regularly replenish the IcyBreeze units

with ice. *Id.* The injunction would take effect only when the heat index exceeds 88 degrees. Moreover, the court provided that "[i]n the event that mold growth proliferates in the guards' pod" caused by the Third Plan, the state is enjoined "to seal the air vent and provide a sufficient number of additional IcyBreeze units to each plaintiff in order to maintain the heat index" to "below 88 degrees Fahrenheit." *Id.* at 548. The court concluded that those measures would sufficiently lower "the indices to which Plaintiffs are exposed" to "below the 88-degree benchmark." *Id.*

The state appealed, contending that the district court had violated the *Ball I* mandate by (1) ordering a maximum heat index and (2) requiring air conditioning in the form of IcyBreeze machines. The state also maintains that the court violated Federal Rule of Evidence 408 by introducing evidence of the Third Plan.

## II.

■ "We review *de novo* a district court's application of [a] remand order, including whether the law-of-the-case doctrine or mandate rule forecloses the district court's actions on remand." *United States v. Teel*, 691 F.3d 578, 583 (5th Cir. 2012) (citation omitted). In their briefs and at oral argument, plaintiffs insist that we should review the modified injunction for abuse of discretion. Although modifications of injunctions are typically reviewed for abuse of discretion, *see Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 190 (5th Cir. 2008), the issue here is whether that modification was barred by *Ball I*'s mandate.[3] Accordingly, we review *de novo*

---

3. Plaintiffs rightly point out that injunctions must "remain open to appropriate modification." *See Brown v. Plata*, 563 U.S. 493, 542–45, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011). But that does not give district courts *carte*

*blanche* to ignore a mandate. Though the injunction remains open to change, any modifications must be made within the confines of our circuit's decisions, subject to the few recognized exceptions to the mandate rule. *Cf.*

whether the modified injunction violates the mandate rule or the law-of-the-case doctrine.[4]

■■■ "Under the law-of-the-case doctrine, an issue of fact or law decided on appeal may not be reexamined either by the district court on remand or by the appellate court on a subsequent appeal." *United States v. Carales–Villalta*, 617 F.3d 342, 344 (5th Cir. 2010) (internal citation omitted). "The mandate rule is but a corollary to the law of the case doctrine." *United States v. McCrimmon*, 443 F.3d 454, 460 (5th Cir. 2006). Both give way to three exceptions: "(1) [T]he evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; (3) the earlier decision is clearly erroneous and would work a manifest injustice." *Id.*; *Gene & Gene, L.L.C. v. BioPay, L.L.C.*, 624 F.3d 698, 702 (5th Cir. 2010). On remand, a district court must implement "both the letter and the spirit" of the panel's mandate. *McCrimmon*, 443 F.3d at 459.

### A.

Plaintiffs suggest that the new-evidence exception applies to override the mandate

*League of United Latin Am. Citizens v. City of Boerne*, 675 F.3d 433, 437–39 (5th Cir. 2012) (holding that, in deciding whether to modify a consent decree, a district court could not ignore instructions regarding the proper procedures to follow); *Baum*, 513 F.3d at 187 (indicating that injunctions may not be modified in violation of the mandate rule).

Because, as we note below, one of those exceptions is for new and substantially different evidence, the mandate rule essentially dovetails with the issuing court's authority to modify an injunction in light of changed circumstances. *See Sys. Fed'n No. 91, Ry. Emp't Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (stating that a court "cannot be required to disregard significant changes in law or facts" and that "[a] balance must therefore be struck between the policies of res judicata and the right of the

rule. We disagree. The only new evidence plaintiffs can point to is the Third Plan itself and allegedly new scientific testimony. But all of the relevant testimony—especially Vassallo's critical testimony—was materially unchanged.[5] And the evidence of the Third Plan itself could be relevant only in that it proved the feasibility of the Third Plan. Because the state's claims center on the propriety of a maximum heat index and the potential for air conditioning, such evidence would be irrelevant to our application of the mandate rule.[6] Accordingly, no exception to that rule applies.

### B.

The state's primary claim is that the district court violated the mandate rule by effectively requiring a maximum heat index. According to the state, *Ball I* foreclosed relitigating whether the Constitution required setting a maximum heat index. And, the state contends, the district court misapplied *Ball I* by finding that a maximum heat index was necessary to remedy the constitutional violation. *Cf. Nat'l Airlines*, 430 F.2d at 960. Plaintiffs reply only

court to apply modified measures to changed circumstances"). The crucial consideration, therefore, is whether circumstances not present at the time of *Ball I* justify a maximum heat index. As we demonstrate *infra*, they do not.

4. *Cf. League of United Latin Am. Citizens*, 675 F.3d at 437–39; *Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 430 F.2d 957, 960 (5th Cir. 1970).

5. *Cf. Gene & Gene*, 624 F.3d at 704–05 (requiring evidence that was new and "substantially different" from that presented to the panel).

6. *Cf. Nat'l Airlines*, 430 F.2d at 960 (explaining that new evidence cannot result in reopening issues squarely foreclosed by a previous appeal).

that the specific measures required by the district court were blessed in Ball I.

■ We agree with the state. *Ball I* plainly foreclosed any consideration of a maximum heat index. As that panel explained, "The *Gates* court did not mandate a maximum heat index," and the district court had to "limit its relief" to the kinds of measures found in *Gates. Ball I*, 792 F.3d at 599–600.[7] Although well-intentioned, the district court, to the contrary, both considered and accepted the need for a maximum heat index.[8]

Relying on a maximum heat index of 88 degrees, the court concluded that the Second Plan was inadequate because it exposed plaintiffs to heat indices above that. And based on that same maximum, the court adopted the Third Plan because it would lower the heat indices to below 88 degrees.[9] Moreover, the court gave a provisional order regarding the possibility of mold growth—in that event, the state would have to provide enough IcyBreeze units to keep the heat index below 88

degrees. Therefore, the court violated the mandate by incorporating a maximum heat index into its order. Based on that violation, we reverse and remand the injunction.

On remand, the district court must reevaluate the necessity of the Third Plan even without a maximum heat index. It may well be that parts of the Third Plan are still necessary to redress the constitutional violation: *i.e.*, "housing these prisoners in very hot cells *without sufficient access to heat-relief measures*." *Id.* at 596 (emphasis added).[10] But the court cannot decree whether any given plan is necessary to lower the heat index to below a maximum, nor can it require the state to provide an undetermined number of Icy-Breeze units or other measures to keep the heat index below a certain point.

The district court must ensure that any relief "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the viola-

---

7. Indeed, Judge Reavley *dissented* on the basis of allowing a maximum heat index. *Ball I*, 792 F.3d at 600 (Reavley, J., dissenting) (stating "I would affirm the injunction which in principal only orders the heat index in the Angola death row tiers to be maintained below 88 degrees").

8. For instance, the court repeatedly found that the only way to correct the Eighth Amendment violation would be to "lower the temperature and heat indices to which Plaintiffs are exposed." *Ball*, 223 F.Supp.3d at 537.

9. Specifically, the court reasoned that the Second Plan would not lower the heat index but that the Third Plan would lower it to "below the 88-degree benchmark." *Id.* at 545.

10. "[T]he Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Ball I*, 792 F.3d at 592 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)) (internal quotation marks omitted). That in-

volves some balancing: "In Eighth Amendment cases, plaintiffs can only obtain a remedy that reduces the risk of harm to a socially acceptable level. Some risk is permissible and perhaps unavoidable." *Id.* at 599.

In accord with this reasoning, our precedent generally has eschewed setting maximum temperatures for prisons. *See, e.g., Hinojosa v. Livingston*, 807 F.3d 657, 670 (5th Cir. 2015) (explaining the Eighth Amendment right "not to be subjected to extreme temperatures without adequate remedial measures" and noting that "the provision of fans, ice water, and daily showers can suffice"); *Valigura v. Mendoza*, 265 Fed.Appx. 232, 235 (5th Cir. 2008) (per curiam) (noting that "temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment"); *Gates*, 376 F.3d at 339–40 (approving of fans, ice water, and daily showers when the heat index is above 90 degrees).

tion." *Id.* at 598 (quoting 18 U.S.C. § 3626(a)(1)(A) ). And although the court is not limited to the specific relief approved of by *Gates*, it may not order measures that are more extensive or intrusive than was the relief in *Gates. See id.*

## C.

It will help the district court and the parties for us to examine whether some of the specific measures required by the Third Plan exceed the *Ball I* mandate. The state suggests that the IcyBreeze machines might be construed as air conditioning—which *Ball I*, *id.* at 599, expressly forbade. The state posits that IcyBreeze machines are functionally much like air conditioning in that they produce cold air.

■ We disagree. As the district court rightly explained, the IcyBreeze units are basically ice chests with fans attached. The chest blows out cool air but does not emit water vapor. In short, they are similar to evaporative coolers. And *Ball I* specifically approved of remedial measures such as ice chests and fans. *Id.* More importantly, Icy-Breeze machines are compact and inexpensive, each costing just over five hundred dollars.[11] They therefore fit comfortably within *Ball I*'s admonition that any relief must not be unduly intrusive and must take into account "any adverse impact on public safety or the operation of a criminal justice system." *Id.* at 598–99 (quoting 18 U.S.C. § 3626(a)(1)(A) ).

The rest of the injunction does not exceed the *Ball I* mandate. For example, the *Ball I* court specifically approved of requiring ice, cold showers, and fans. *Id.* at 599. And it allowed diverting cool air from the guards' pod—provided, of course, that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." *Id.* at 598 (quoting 18 U.S.C. § 3626(a)(1)(A) ). Moreover, *Ball I* approved the use of a temperature trigger. *Id.* at 600 (explaining that *Gates* "required particular heat measures … if the heat index reaches 90 degrees or above") (internal quotations omitted).

Indeed, a temperature trigger is necessary to ensure that the injunction is inapplicable "during months when there is no heat risk to the Plaintiffs." *Id.* It is by effectively requiring a temperature *ceiling* that the district court went astray. Accordingly, despite that we reverse based on the erroneous adoption of a maximum heat index, we leave open the possibility that, on remand, the court may require Icy-Breeze units or temperature triggers.

## III.

■ The state posits that the district court admitted evidence of the Third Plan in violation of Federal Rule of Evidence 408.[12] Evidentiary rulings are reviewed for

**11.** The district court also found that the overall cost of the Third Plan was less than $2,000. Compared to the approximately $100,000 that would be required to air-condition Plaintiffs' portion of Tier C, the Third Plan is sufficiently inexpensive to satisfy our concerns relating to the PLRA.

**12.** Although the state also claims that the district court violated Federal Rule of Evidence 407, that contention is undermined by Rule 407's exceptions for feasibility and impeachment evidence. *See* FED. R. EVID. 407

(noting that "the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving … the feasibility of pre-cautionary measures"). On remand, the state suggested that at least some measures in the Third Plan were infeasible. Accordingly, the district court could permit introduction of such evidence to impeach that statement and demonstrate feasibility. *See, e.g., Dixon v. Int'l Harvester Co.,* 754 F.2d 573, 583–84 (5th Cir. 1985); *Muzy-*

abuse of discretion. *Id.* at 591 (citing *Battle ex rel. Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 550 (5th Cir. 2000)). Moreover, "[e]ven if the court abused its discretion, this court will presume the error is harmless." *Id.* (citation omitted). "The party asserting the error has the burden of proving that the error was prejudicial." *Id.* (citation omitted). The state asserts that the court violated Rule 408 because the Third Plan was regarding conduct during compromise negotiations and was a subsequent remedial measure.

Rule 408 precludes admitting any "conduct or ... statement made during compromise negotiations about the claim" "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." FED. R. EVID. 408(a)(2). Moreover, the parties stipulated that "any discussions or actions taken [with regard to the Third Plan] would not be admissible as evidence in this case pursuant to ... Federal Rule of Evidence 408(a)(2)." The district judge even communicated, through the Special Master, that "the implementation of any efforts or measures, on a trial basis," would not be "viewed as spoliation or destruction of evidence" and that the discussions would remain confidential so long as the parties so requested. Accordingly, the Third Plan and any accompanying discussions were "conduct" and "statement[s] made during compromise negotiations." FED. R. EVID. 408(a)(2).

■ Yet Rule 408 contains a broad exception: "The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." FED. R. EVID. 408(b). Here, the other purpose relates to the court's ongoing supervisory power over its injunction. *See Plata*, 563 U.S. at 542–45, 131 S.Ct. 1910. The district court may have been concerned about how the Third Plan would affect the prisoners and their constitutional rights; the court also could have wanted to know whether the Third Plan was more efficient than the Second Plan.[13]

Moreover, "Rule 408 should not exclude more than required to effectuate its goals, which, after all, run counter to the overarching policy favoring admission of all relevant evidence." *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 299 (5th Cir. 2010). Courts must ensure that Rule 408 remains "tethered to the rationales underlying the rule." *Id.* at 298. Those rationales—the irrelevancy of such evidence and the public policy in favor of compromise—are inapplicable here.[14] The evidence was relevant and probative. And the public policy in favor of compromise could be satisfied by excluding any negotiations[15]—which would have formed the basis for the state to move to modify the injunction or enter a consent decree—but still admitting conduct affecting the prisoners' constitutional rights (a manifest public policy concern, *see Plata*, 563 U.S. at 510–11, 542–43, 131 S.Ct. 1910). Accordingly, the district court did not abuse its discre-

---

*ka v. Remington Arms Co.*, 774 F.2d 1309, 1310–13 (5th Cir. 1985).

13. *See Plata*, 563 U.S. at 542, 131 S.Ct. 1910 (stating that "[a] court that invokes equity's power to remedy a constitutional violation by an injunction ... has the continuing duty and responsibility to assess the efficacy and consequences of its order").

14. *See* FED. R. EVID. 408 advisory committee's note to 1972 proposed rule; *Lyondell*, 608 F.3d at 299; *Kennon v. Slipstreamer, Inc.*, 794 F.2d 1067, 1069 (5th Cir. 1986).

15. Indeed, the district court did not admit any evidence of the parties' statements or negotiations.

tion by admitting evidence of the Third Plan itself.[16]

Because the district court erroneously addressed the propriety of a maximum heat index, found that it was necessary, and issued a modified injunction that in certain instances incorporated it, the order imposing the modified injunction is RE-VERSED and REMANDED. We are confident that, on remand, the district court will conscientiously proceed in a manner that is consistent with this opinion and Ball I.

STEPHEN A. HIGGINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority opinion that the injunction should be vacated to the extent it orders the state to maintain the heat index below 88 degrees. However, because, as the majority opinion recognizes, "the rest of the injunction does not exceed the *Ball I* mandate," I would affirm it. The relief measures ordered, including IcyBreeze units and diverted cool air, are consistent with the less-intrusive remedies suggested in *Ball I* and extend no further than necessary to correct plaintiffs' constitutional injury.

I write briefly to explain my view of the role of the mandate rule in this case. In its application of the mandate rule, the majority opinion reverses the district court's order despite concluding that most of the

relief ordered "does not exceed the *Ball I* mandate." It reasons that the district court erred by "[r]elying on a maximum heat index"—even though the injunction does not generally mandate one—because "*Ball I* plainly foreclosed any consideration of a maximum heat index."

But in *Ball I*, our court was clear that "[t]he district court did not abuse its discretion by admitting evidence of or *relying* on the heat index." *Ball v. LeBlanc (Ball I)*, 792 F.3d 584, 591 (5th Cir. 2015) (emphasis added). And for good reason. The heat index is the unit of measure consistently used in the medical and scientific literature to measure and identify the risk of heat-related illness. *See id.*; *Ball v. LeBlanc*, 223 F.Supp.3d 529, 537 (M.D. La. 2016). To forbid the district court from considering a maximum safe heat index is to require that court to remedy the constitutional violation that we have found exists, *see Ball I*, 792 F.3d at 596, without considering its cause. The record evidence, credited by the district court and not substantively challenged on appeal, demonstrates that these medically compromised plaintiffs face a risk of serious harm when they are exposed to heat indices above 88 degrees. *See Ball*, 223 F.Supp.3d at 536–37. That factual finding must be considered when the district court assesses whether any heat-remediation plan is sufficient to remedy plaintiffs' Eighth Amendment injury.[1] *See Graves v. Arpaio*, 623

---

16. The parties would benefit from clearer notice of what is and is not admissible. For instance, the district court could have communicated, prospectively, that any actions would be admissible but that statements made during negotiations would not be admissible.

1. This is not to say that a constitutionally sufficient heat-remediation plan must maintain a heat index *below* 88 degrees. The district court found that the risk of serious harm due to heat "significantly increases when an individual is exposed to heat indices of 88

degrees or greater." *Ball*, 223 F.Supp. at 537. But the Eighth Amendment does not protect against any and all risk of harm; rather, it protects against "extreme" conditions, *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), that present an "unreasonable risk" of harm, *Helling v. McKinney*, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Determining whether "conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that

F.3d 1043, 1049–50 (9th Cir. 2010) (affirming injunction requiring sheriff to house pretrial detainees taking psychotropic medications in temperatures that do not exceed 85 degrees based on finding that exposure to higher temperatures presents an unreasonable risk of harm).

Of course, if the district court truly did conclude that the Second Plan was inadequate simply because it failed to *maintain* a heat index below 88 degrees, that might in practice be the same as mandating a maximum heat index and thus violate our court's *Ball I* mandate (absent relevant new evidence). *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (stating that mandate rule requires lower court to implement "both the letter and the spirit of the appellate court's mandate" (quoting *United States v. Becerra*, 155 F.3d 740, 753 (5th Cir. 1998) ) ). But the district court concluded that the Second Plan was inadequate because of plaintiffs' testimony that they "continued to experience heat-related symptoms during the implementation of Defendants' Second Plan" and expert testimony that cool showers, ice, and fans, without more, did not eliminate the substantial risk of serious harm that these plaintiffs face from extreme heat. *Ball*, 223 F.Supp.3d at 536–37, 544–45. To be sure, the district court further

concluded, based on the testimony of plaintiffs' expert, that "[t]he *only* means to reduce the substantial risk of serious harm to Plaintiffs, and thereby remedy the Eighth Amendment violation in this case, is to lower the temperatures and heat indices to which Plaintiffs are exposed." *Id.* at 545. But, in a facility where the heat index frequently exceeds 100 degrees and has risen as high as 110.3 degrees, *id.* at 531–32, requiring the state to lower the heat indices to which these medically compromised plaintiffs are exposed is not the same as mandating that the heat index remain below 88 degrees. It is only the latter that (absent relevant new evidence) *Ball I* forbids.

Contrary to the majority opinion's assertion, *Ball I* did not foreclose relitigating on remand whether a maximum heat index, or any other form of relief, could be necessary to remedy these plaintiffs' constitutional injury. By explicitly noting that "*Gates* upheld an injunction providing narrower relief" and that there was "no showing that the Constitution mandated more relief for these prisoners for the same prison condition in this case," 792 F.3d at 600, *Ball I* contemplated the possibility that new evidence could require other—possibly broader—relief.[2] That was for

---

such injury to health will actually be caused." *Id.* at 36, 113 S.Ct. 2475. Determining the relevant level of risk "also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Id.* In other words, that there is some risk of harm when the heat index exceeds 88 degrees does not necessarily mean that the Eighth Amendment requires a heat index below that number.

**2.** The majority opinion states that *Ball I* "closed the door to air conditioning as a permissible remedy here." I agree, but only because plaintiffs did not produce any sub-

stantively new evidence demonstrating that air conditioning—in the sense of mechanical cooling—is necessary to remedy their constitutional injuries. However, I disagree to the extent that the majority opinion suggests that *Ball I* closed the door to air conditioning regardless of any new evidence presented. I read *Ball I* to narrowly say that air conditioning was not a permissible remedy absent evidence that the more modest measures approved of in *Gates* were insufficient for these plaintiffs. In *Yates v. Collier*, 868 F.3d 354 (5th Cir.2017), two of our colleagues from the *Ball I* panel confirmed that "*Ball [I]* held that air-conditioning was not appropriate in that case because other acceptable and less-intrusive remedies had yet to be tried—not that

good reason. Injunctions must be open to modification in light of new facts or changed circumstances. *See Brown v. Plata*, 563 U.S. 493, 542–43, 131 S.Ct. 1910, 179 L.Ed.2d 969 (2011) ("A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. ... [A] court must remain open to a showing ... that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection."). No mandate can change that. *See Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 190 (5th Cir. 2008) (stating, in context of a law-of-the-case challenge, that "[m]odification of an injunction is appropriate when the legal or factual circumstances justifying the injunction have changed" (quoting *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 445 F.3d 841, 850 (5th Cir. 2006)))); *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1360 (Fed. Cir. 2008) (stating that the mandate rule "does not preclude the district court from modifying, or dissolving, the injunction if it determines that it is no longer equitable"); *Matthews*, 312 F.3d at 657 (stating that the law of the case doctrine, which includes the mandate rule, "merely expresses the practice of courts generally to refuse to reopen what has been decided, [it is] not a limit to their power" (quoting *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912)))).

While it is true, as the majority opinion notes, that the new-evidence exception to the mandate rule is inapplicable to issues squarely foreclosed by a previous appeal, whether a different remedy could be nec-

essary under unaddressed new facts is not an issue that can be squarely foreclosed. *Ball I* held only that the evidence *then in the record* was insufficient to establish the necessity of facility-wide air conditioning and/or a maximum heat index of 88 degrees. To suggest, as I think the majority opinion does, that *Ball I*'s record-specific holding forecloses future litigation of the necessity of those remedies is to imply that the mandate rule restricts a district court's authority, and indeed duty, to modify an injunction in light of changed circumstances. But that is contrary to established law. *See, e.g., Baum*, 513 F.3d at 190.

The static quality that I fear the majority's opinion may inject into our Eighth Amendment jurisprudence is also inconsistent with the nature of Eighth Amendment rights. *Gates* does not set a ceiling for permissible heat-relief measures in prisons. "No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion)). Whether conditions of confinement amount to an Eighth Amendment violation necessarily depends on the context-specific "totality of the circumstances." *Id.* at 362–63, 101 S.Ct. 2392. Courts must be free to consider those circumstances, as they change, and in light of evolving standards of decency, when determining what relief the Eighth Amendment requires.

---

air-conditioning was necessarily an impermissible remedy." *Id.* at 370. *Yates* is a clarification of, and consistent with, *Ball I. See* 792 F.3d at 600 (noting absence of evidence that plaintiffs in this case require more extensive

relief than plaintiffs in *Gates*). Furthermore, as the majority opinion recognizes, some form of cooled air—be it from an IcyBreeze unit or diverted cool, *i.e.,* air-conditioned, air—can be a permissible remedy.

Because there was no new evidence submitted relevant to the necessity of an 88 degree maximum heat index, I would vacate just that single provision of the injunction mandating such a maximum heat index. The rest of the injunction, ordering remedies previously approved of by us, is consistent with *Ball I* and the PLRA, particularly given the evidence presented that the *Gates* remedies alone were insufficient to remedy plaintiffs' constitutional injuries. I would therefore affirm it.