# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 13, 2022

Lyle W. Cayce
Clerk

No. 21-10771

CHAD WILSON, INDIVIDUALLY AND AS NEXT FRIEND OF S.W.;
MARTHA WILSON, INDIVIDUALLY AND AS NEXT FRIEND OF
S.W.,

*Plaintiffs—Appellants*,

*versus*

CITY OF SOUTHLAKE,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:16-CV-57

Before WILLETT, ENGELHARDT, and WILSON, *Circuit Judges*.
PER CURIAM:*

Plaintiffs-Appellants Chad and Martha Wilson ("the Wilsons"), individually and as next friends of S.W., appeal the district court's July 9, 2021 summary judgment dismissal of their intentional discrimination claims asserted under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act ("ADA"). The Wilsons' claims against

---

* This opinion is not designated for publication. *See* 5TH CIRCUIT RULE 47.5.4.

Defendant-Appellee City of Southlake ("Southlake") arise from a January 23, 2014 encounter between then-Sergeant Randy Baker of the Southlake Police Department and S.W., an eight-year-old second-grade student at Carroll Elementary School. Baker worked as one of the uniformed school resource officers ("SROs") for the schools operated by the Carroll Independent School District ("CISD"). Responding to a call for assistance from SRO Robert Slusser, Baker handcuffed S.W., within seconds of his arrival, upon observing S.W. screaming obscenities and swinging a child's jump rope in close proximity to the school principal, Stacy Wagnon, and Slusser.

After telling S.W. that he had been handcuffed for his safety and the safety of others, Baker sat S.W. in a chair in the principal's office. He then yelled, rebuked, and verbally sparred with S.W. for approximately 15 minutes regarding the student's misbehavior at school that day and on January 7, 2014. During part of this verbal exchange, Baker sat face-to-face with S.W., and, at one point, undisputedly lost his temper when S.W. told Baker: "I'm going to kill you." Wagnon and Slusser, as well as the school counselor, Jennifer Bailey, remained in the room (or an adjoining one) during the exchange between Baker and S.W. but did not interfere. Baker removed the handcuffs when S.W.'s parents—whom the school office staff had summoned, at Wagnon's direction, when she and Bailey were unable to control S.W.'s behavior—arrived to collect the child.

Following an internal affairs investigation regarding the January 23, 2014 incident, the Southlake Chief of Police determined that Baker's verbal interaction with S.W. had violated a number of the police department's rules of conduct. As a result, Baker's employment was terminated. Thereafter, the Wilsons sued Southlake and Baker, asserting various federal and state law claims on behalf of S.W. On November 28, 2017, the district court granted summary judgment in favor of Southlake based on the "exigent

No. 21-10771

circumstances" exception to the application of the ADA and the Rehabilitation Act that was recognized in *Hainze v. Richards*, 207 F.3d 795, 799, 801–02 (5th Cir. 2000). On appeal, another panel of this court reversed that judgment, finding *Hainze* inapplicable. *See Wilson v. City of Southlake*, 936 F.3d 326 (5th Cir. 2019).[1] Following remand and discovery, the district court again granted summary judgment in Southlake's favor, dismissing the Wilsons' ADA and Rehabilitation Act claims with prejudice. The Wilsons appealed again. Considering the instant record, we AFFIRM.

## I.

The factual background of this matter is more than adequately detailed in the parties' extensive briefs, the panel opinion from the prior appeal in this matter, the district court's written rulings, and the numerous record documents. And, of course, no one is more familiar with the facts than the parties and their counsel. Thus, we need not undertake a comprehensive background discussion herein. Instead, we summarize the January 23 encounter, as well as a January 7, 2014 incident involving S.W., school personnel, and Slusser, as follows:

### A. January 7, 2014 Incident

On January 7, 2014, S.W. was serving an in-school suspension ("ISS") in Wagnon's office. At approximately 9:15 a.m., Bailey summoned Slusser to Wagnon's office. When he arrived, Slusser observed S.W. scream at Wagnon and Assistant Principal Angie George and overturn two chairs. Slusser entered the office but initially remained silent. Thereafter, both

---

[1] In *Hainze*, this court recognized an "exigent circumstances" exception to the application of the ADA and the Rehabilitation Act. Reviewing the district court's initial summary judgment in favor of Southlake, the previous panel concluded the "exigent circumstances" exception did not apply because, unlike in *Hainze*, Sergeant Baker encountered an eight-year-old student with a jump rope, not a "potentially life-threatening situation or threat to human life." *See Wilson*, 936 F.3d at 331.

Wagnon and Slusser unsuccessfully attempted to calm S.W. by explaining why he still had ISS hours to complete and telling him that "everyone at the school cares about [him]." Despite their efforts, S.W. continued to scream about ISS and attempted to overturn a table.

When Wagnon asked S.W. to sit down and do his work, S.W. punched her in the stomach and kicked her in the leg. He also told Wagnon and Slusser that he would have to kill them and said that if Wagnon "kept up her behavior," his "mother is going to sue for a million bucks." S.W. twice picked up a chair as if to throw it, but then put the chair down when Wagnon and Slusser instructed him to do so, "stood back[,] and let [him] have plenty of space." S.W. still continued to complain about ISS and scream that he was going to kill someone. Notably, however, he did not mention using or having a weapon.

S.W. again kicked Wagnon a second time; this time in the knee. Then, after asking Wagnon and Slusser if they wanted to see his penis, S.W. pulled down his pants and undergarment to his knees, exposing himself. After Slusser pulled up S.W.'s clothing and placed him in a chair, S.W. threatened to tase them with Slusser's taser and then shoot them with Slusser's gun. S.W. then removed a jar from a shelf, acting as if he was going to throw it, but Slusser removed the jar from his grasp. Despite Slusser's attempts to calm S.W. with general conversation about Christmas, S.W. picked up the jar again and threw it at Slusser, hitting him in the knee, and continued to scream death threats and obscenities. He also told Slusser to "shut up" and said: "When I get mad, I can't control myself."

After unsuccessfully attempting to call his mother using Wagnon's office telephone, S.W. walked around the room, picked up and threw a chair, and then picked up a jar of beans, throwing it at the ground and breaking it.

S.W. then started to cry and screamed that he was going to kill someone, break out of the window, and escape.

The January 7, 2014 encounter ended when S.W. left the school with his parents. According to Slusser: "We were able to use verbal crisis prevention techniques until S.W.'s parents arrived to pick up. Although we gave him space and tried to engage in conversation, S.W. never calmed down while he was in Principal Wagnon's office." *See* Slusser's Oct. 5, 2020 Decl., ¶ 8.

B. January 23, 2014 Incident

On January 23, 2014, S.W. returned to school for the first time since the January 7 incident. Because he had not yet completed his ISS hours, he reported to Wagnon's office rather than his usual classroom. As soon as S.W. was told to begin his schoolwork, however, he indicated that he would not cooperate, made rude remarks, including profanity, and told Wagnon that, if she touched him, his parents would sue her and CISD "would have to pay for a private school."

When Wagnon offered to help S.W. with his assignment, he became visibly upset, continued uttering obscenities, "crumpled up the papers," and threw them and his pencil on the floor. Wagnon asked S.W. to read a book, but he threw it off the table, screaming, "I don't care." Then, S.W. stated: "I brought something in my backpack," adding that it was for "self-defense." At that point, Wagnon asked Slusser to come to her office. And, at approximately 9:40 a.m., Wagnon instructed the front office to call the Wilsons and ask them to come to the school.

Wagnon asked to see what was in S.W.'s backpack, but S.W. declined to show her. S.W. indicated that it was a weapon "deadly to squirrels and other small animals," but not humans. Wagnon attempted to search the backpack, but S.W. threw papers in her face. He also threw a cup of hot

No. 21-10771

coffee at Wagnon, which missed her but hit the wall.  S.W. then took from his backpack what he called a "homebuilt nunchuck," which actually was a jump rope that the school had given him as part of "Jump Rope for the Heart."  After S.W. twice tried to hit Wagnon with the item, and twice tried to kick her, Slusser radioed Baker for backup.

Wagnon told S.W. that she would ask Slusser to confiscate the item if he did not turn it over.  S.W. refused, screamed obscenities, and then ran into the hallway.  At 9:47 a.m., Baker entered the hallway, where S.W. continued to scream obscenities and was swinging his rope.[2] At approximately 9:47:48 a.m., Baker can be heard asking someone (presumably Slusser): "Why is he swinging that around?"

It is disputed whether, during this time, S.W. was told to stop his misconduct, kicked or attempted to kick Wagnon, and hit or attempted to hit Baker. The statements provided by Baker, Slusser, and Wagnon (at varying times), regarding the events occurring in the hallway in the seconds before Baker handcuffed S.W., do not provide a sufficiently clear and consistent account for a definitive determination to be made. However, at approximately 9:47:55 a.m., someone other than S.W. can be heard (on the audio recording) saying "Stop it!" in a sharp, firm tone.[3]

## II.

Summary judgments rendered pursuant to Federal Rule of Civil Procedure 56 are reviewed *de novo*, applying the same standard as the district court. *Aggreko, L.L.C. v. Chartis Specialty Ins. Co.*, 942 F.3d 682, 687 (5th Cir.

---

[2]  Baker's police vehicle's audio-visual equipment provided a sound recording of certain portions of the January 23, 2014 incident

[3]  Bailey's notes from the January 23, 2014 encounter attribute this instruction to Wagnon.

2019) (quoting *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 417 (5th Cir. 2016)). However, "[w]e may affirm the district court's grant of summary judgment on any ground supported by the record and presented to the district court." *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 273 (5th Cir. 2015).

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 456 (5th Cir. 2003) (internal quotation marks and citation omitted). "A genuine [dispute] of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017). The resolution of a genuine dispute of material fact "is the exclusive province of the trier of fact and may not be decided at the summary judgment stage." *Ramirez v. Landry's Seafood Inn & Oyster Bar*, 280 F.3d 576, 578 n.3 (5th Cir. 2002). Thus, the court must not weigh evidence or make credibility findings, and construes all facts and reasonable inferences in favor of the nonmovant. *Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009).

## III.

On appeal, the Wilsons contend that the district court erred in granting summary judgment on the merits of their ADA and Rehabilitation Act claims against Southlake. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Public entities" include local governments. 42

No. 21-10771

U.S.C. § 12131(1)(A). Section 504 of the Rehabilitation Act of 1973 provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

The remedies, procedures, and rights available under the ADA parallel those available under the Rehabilitation Act. *Delano-Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir. 2002) (quoting 42 U.S.C. § 12133). "Thus, '[j]urisprudence interpreting either section is applicable to both.'" *Id.* (quoting *Hainze*, 207 F.3d at 799). "The only material difference between the two provisions lies in their respective causation requirements." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).

To establish a *prima facie* case under either statute, a plaintiff must show: "(1) that he is a qualified individual . . .; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (quoting *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004)). Under Section 504 of the Rehabilitation Act, the plaintiff must establish that disability discrimination was the sole reason for the exclusion or denial of benefits. *Id.* at n.1. Under Title II of the ADA, however, "discrimination need not be the sole reason." *Id.*

The Supreme Court has held that prisons are public entities that may not exclude disabled individuals from participation in, or deny them the benefits of, their services, programs, or activities. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). And, in *Windham v. Harris Cnty., Texas*, 875 F.3d 229, 235–36 (5th Cir. 2017), this court recognized Title II claims in the specific context of police officers who fail to reasonably accommodate the known limitations of disabled persons they detain. *See also Delano-Pyle*, 302 F.3d at 570–71, 575–76 (affirming jury verdict that police officers discriminated against deaf arrestee by failing to accommodate the limitations arising from his inability to hear); *Hainze*, 207 F.3d at 802 ("Once the area was secure and there was no threat to human safety, the . . . Sheriff's deputies would have been under a duty to reasonably accommodate Hainze's disability. . . ."); *Waller ex rel. Est. of Hunt v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009) ("In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees.").

"[T]he ADA requires [public entities] to reasonably accommodate limitations, not disabilities." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996). Thus, "a critical component of a Title II claim for failure to accommodate [] is proof that 'the disability *and* its consequential limitations were known by the [entity providing public services].'" *Windham*, 875 F.3d at 236 (emphasis added) (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr.*, 633 F. App'x 214, 215–16 (citing *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013))); *accord Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). In this context, "limitations" refers to the effect that a disability has on a person's life. *Taylor*, 93 F.3d at 164. "Mere

knowledge of the disability is not enough; the service provider must also have understood 'the limitations [the plaintiff] experienced . . . *as a result* of that disability.'" *Windham*, 875 F.3d at 236 (quoting *Taylor,* 93 F.3d at 164 (emphasis added)); *accord Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 444–45 (5th Cir. 2017); *Jin Choi*, 633 F. App'x at 216.[4] "Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances." *Windham,* 875 F.3d at 236; *see id.* ("'The ADA does not require clairvoyance.'"(quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995))). Accordingly, the plaintiff must "specifically identify the disability and resulting limitations, and [] request an accommodation in direct and specific terms." *Windham,* 875 F.3d at 237 (internal quotation marks and citations omitted).

When a plaintiff has not requested an accommodation in this manner, he must show that "'the disability, resulting limitation, *and* necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* (emphasis added) (quoting *Taylor*, 93 F.3d at 165); *accord Jin Choi*, 633 F. App'x at 216. This is because "knowledge of a disability is different from knowledge of the resulting limitation" and "certainly is different from knowledge of the necessary accommodation." *Windham,* 875 F.3d at 238.

Where a disability is mental, rather than physical, the disability, resulting limitations, and necessary reasonable accommodations often are not "open, obvious, and apparent." *Taylor*, 93 F.3d 165. Rather, in that

---

[4] Although these principles were developed in cases applying Title I, *e.g.*, *Taylor*, 93 F.3d at 163–65, the rules likewise apply in the context of Title II. *Windham*, 875 F.3d at 236 n. 9; *see also Jin Choi*, 633 F. App'x at 215–16; *Ball*, 792 F.3d at 596 n.9.

context, a health care provider is "best positioned to diagnose [] disabilities, limitations, and possible accommodations." *Id.*

Finally, to recover compensatory damages, a plaintiff must also prove that the discrimination was intentional. *Delano-Pyle*, 302 F.3d at 574. "This court has hesitated to 'delineate the precise contours' of the standard for showing intentionality." *Cadena*, 946 F.3d at 724 (quoting *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018)). Of course, this standard is met under circumstances revealing a discriminatory motive. Otherwise, Fifth Circuit cases discussing the issue have required "something more than 'deliberate indifference.'" *Id.* (quoting *Miraglia*, 901 F.3d at 575 (quoting *Delano-Pyle*, 302 F.3d at 575)); *see also Smith v. Harris Cnty.*, 956 F.3d 311, 318 (5th Cir. 2020) (same).

## IV.

The Wilsons claim that Baker's conduct on January 23, 2014 constituted intentional discrimination, under the Rehabilitation Act and the ADA, based on two separate theories: (1) disparate treatment and (2) failure to provide reasonable accommodations. It is undisputed that, at the relevant time, S.W. had been diagnosed with Autism, Anxiety, and ADHD, and was a qualified individual with a disability. Thus, the first requirement for establishing a *prima facie* claim is satisfied.

As to the second and third requirements of their claims, the Wilsons argue that Baker's January 23, 2014 conduct creates, at a minimum, a genuine dispute of material fact as to whether he intentionally discriminated against S.W. "by reason of" his disability. Specifically, the Wilsons emphasize Baker's decision to handcuff S.W. within only 20-30 seconds of Baker's arrival, rather than first attempting to de-escalate the situation by using methods other than physical intervention. Then, the Wilsons contend, Baker aggravated the situation by shouting at S.W. for the next fifteen minutes—

calling him a "punk" and a "brat"—while the child remained handcuffed and "clearly in distress." Quoting the police chief's characterization of Baker's conduct as "unprofessional, sarcastic, and antagonistic," as well as "inexcusable and unreasonable," the Wilsons maintain that Baker's "sustained antagonism" reflected a complete lack of patience and deep-seated animosity toward S.W., demonstrating the existence of a triable factual dispute relative to whether this behavior suffices to show "bad faith, prejudice, ill-will, or spite" based on S.W.'s disability.

The Wilsons also argue that the record establishes the existence of triable issues of fact supporting their reasonable accommodations claim. Regarding the question of whether Sergeant Baker (and thus Southlake) had sufficient notice of S.W.'s disability, limitations, and need for accommodation(s), the Wilsons reference information provided to school personnel, contending the "information [] was (or, at a minimum, should have been) shared with Sergeant Baker." And, they contend: "Sergeant Baker also had repeated exposure to S.W.'s difficulties, including from a highly similar incident that took place two weeks before the incident in question." Finally, they argue that, in any event, Southlake had the necessary notice because S.W.'s disability and need for an accommodation were "open, obvious, and apparent" to Baker.[5]

---

[5] Referencing certain language in the prior panel opinion in this matter, the Wilsons additionally argue that the "law of the case" doctrine precludes an adverse summary judgment ruling premised on the sufficiency of Baker's awareness of S.W.'s disability, limitations, and need for reasonable accommodation. This argument fails for a number of reasons. The law of the case doctrine is a discretionary practice, not a jurisdictional rule. *See, e.g., United States v. Lee*, 358 F.3d 315, 320–21 (5th Cir. 2004); *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002). Moreover, the doctrine applies only to matters actually decided on prior appeal. Despite including the language on which the Wilsons now rely, the prior panel's opinion emphasizes that the *only* issue determined in that pre-discovery appeal was whether the *Hainze* "exigent circumstances" exception entitled Southlake to summary judgment. Indeed, the opinion specifically states:

No. 21-10771

Regarding an appropriate accommodation, the Wilsons contend that Baker should have acted as Slusser did. That is, "by speaking to [S.W.] in a calm tone of voice, providing S.W. sufficient space, and, when necessary, taking control of objects that . . . might cause a problem."

V.

The district court found the Wilsons' evidentiary support insufficient to avoid summary judgment on either of their theories. In reviewing this decision, we emphasize that the issues before us do *not* include whether Baker's verbal exchange with S.W. was unprofessional, inappropriate, unkind, and/or unproductive. Rather, our review is limited to deciding *only* whether the Wilsons have put forth sufficient evidence to have their ADA and Rehabilitation Act damage claims submitted to a jury for determination. Having carefully considered the parties' briefs, the record, and applicable law, we agree with the district court's assessment. The Wilsons' position is long on conclusions and speculation but fatally short on actual evidence of intentional discrimination.

A. Reasonable Accommodation

Focusing first on the Wilsons' reasonable accommodation claim, it is undisputed that Baker had not actually met S.W. prior to the January 23, 2014 incident. Notably, Baker's deposition testimony also indicates that, as of January 23, 2014, he: (1) "didn't know [S.W.] had a disability"; (2) was not "included on any communication between . . . a principal and a parent"; (3) did not recall being told or reading that S.W. suffered from autism; (4) had no "reason to believe that S.W. had autism or another disability

"To be clear, we decide this case solely on the issues raised on appeal. Thus, we do not offer an opinion on any other potential issues not before us." *Wilson*, 936 F.3d at 333. Consistent with this limitation, the prior panel vacated and remanded without further limiting instructions or directives to the district court.

when[] [he] first saw [S.W.] in January 2014"; (5) thought S.W. was simply "a kid . . . that was acting out . . . misbehaving"; (6) thought S.W.'s "[a]typical" behavior on January 7 and 23, 2014, was "learned behavior"; and (7) questioned where and how S.W. had learned to behave in that manner. In response, the Wilsons maintain that other evidence in the record casts sufficient doubt on the validity of these assertions to render Baker's knowledge of S.W.'s disability, limitations, and need for appropriate accommodation questions to be decided by a jury.

Specifically, the Wilsons point to: (1) Baker's presence at the October 9, 2013 meeting that various school officials, along with Officer Brett Wilson,[6] Baker, and Slusser, held to discuss a plan to verify S.W.'s welfare and obtain help for the family, in light of the suicide threats/comments that S.W. had made with increased frequency during the year; (2) the Wilsons' October 15, 2013 email to Wagnon indicating that S.W. has a "diagnosis of depression, anxiety, as well as aspects of Asperger's [Syndrome]," inquiring "what plan and accommodations will be put in place to address his behavior and statements before his return to school [the next day]," and requesting that persons involved with the October 2013 meetings be notified that S.W. is "under [] psychiatrist and psychologist care"; and (3) Baker's awareness of S.W.'s "difficulties" and "issues" by virtue of having "signed off" on the report that Slusser prepared for the January 7, 2014 incident. Characterizing the January 7, 2014 incident as "highly similar" to the January 23, 2014 incident, the Wilsons argue the report sufficiently notified Baker of S.W.'s inability to cope with instruction from school personnel and resource officers and need for an appropriate accommodation.

---

[6] Officer Brett Wilson was also a City of Southlake police officer. He is not related to the Wilsons.

The record in this matter certainly supports an inference that, prior to January 23, 2014, Baker had *some* awareness of S.W.'s previous behavioral problems. Even so, neither Baker's participation in the October 9, 2013 meeting, the Wilsons' October 2013 email to Wagnon, nor Baker's awareness of S.W.'s January 7, 2014 misconduct support a reasonable inference that, contrary to his sworn testimony, Baker was sufficiently cognizant of S.W.'s particular disability, the corresponding limitations, and the necessary accommodations, to satisfy the Wilsons' summary judgment burden.

Unfortunately, the record lacks any minutes or notes from the October 9, 2013 meeting. Thus, the mere fact of Baker's attendance at the meeting bears little significance. And the related, one-page "Safety Plan," dated October 17, 2013, which "was developed in response to [S.W.'s] multiple threats of self-harm," simply lists various actions to be taken by "district staff" in an effort to ensure S.W.'s safety at school. Notably, the "Safety Plan" does not specify any particular actions or accommodations to be employed if S.W.'s behavior became disruptive or violent. Rather, it reflects a need for *future* collaboration between the school district staff, S.W.'s parents, *and* S.W.'s physicians regarding "expectations related to mood swings, side effects from medication, or any other expected changes."

The October 15, 2013 email to Wagnon likewise lacks important information regarding S.W.'s particular limitations and/or pertinent behavior accommodations. Although the Wilsons were not required to specify all of S.W.'s limitations and necessary accommodations, the vague and general nature of the diagnoses referenced in the email, combined with the Wilsons' refusal, prior to December 2013, to allow the school district to conduct a psychological evaluation of S.W., made it very difficult, if not impossible, for the school district—much less Baker—to determine what specific behavioral

15

accommodations were appropriate and necessary prior to, and during, the January 23, 2014 incident at issue.[7]

In any event, the October 15, 2013 email is directed to Wagnon, *not* Baker, Slusser, or any other member of the Southlake Police Department. Nor is there any indication that Wagnon actually shared the information in the October 15, 2013 email (in accordance with the Wilsons' request therein), or the October 17, 2013 "Safety Plan," with Baker. To the contrary, Wagnon's deposition testimony emphasized that school personnel "share very little personal information with [SROs] about student[s]." And, notably, her October 21, 2013 email indicates that she "understand[s] [the Wilsons] plan[] to follow up with [the Southlake] police and [] encourage[s] [them] to

---

[7] This is particularly true given that, during these times, S.W. was not designated as a "special education" student for purposes of the IDEA. Thus, as the Wilsons knew, the various plans and committees accompanying such a designation were not in place for him. And school personnel reportedly did not know whether S.W.'s escalating misconduct was related to a disability.

Notably, all of these points were emphasized in Wagnon's December 1, 2013 email response to the Wilsons, which explained that, "[c]urrently, [S.W.] is not a student entitled to [the] procedural [and] substantive protections under [the] IDEA" that "are afforded to students receiving special education services under the [IDEA]," and noted the school district's prior offer to "conduct a psychological evaluation of [S.W.] and consider special education eligibility," as well as the Wilsons' "refus[al] to provide consent." The email continues to discuss the school district's concerns regarding S.W.'s escalating behaviors, adding that the Wilsons' failure to cooperate with the district's efforts "to collaborate and develop a more effective behavior plan or other services necessary under [the] IDEA cannot be ignored and, as explained in both the written notice of proposal to evaluate and the procedural safeguards provided to [the Wilsons], impacts the procedural protections related to [S.W.'s] behavior regardless of his disability status." Wagnon adds: "[S]ave and except for your refusal to provide consent for evaluation, [S.W.] would in fact be entitled to an expedited evaluation and ARD committee meeting if indicated at this point, as it would be important to determine whether the escalating behaviors, which now include the incident on Friday[,] which resulted in a disciplinary consequence, may be related to a disability. However, you waived that protection when you refused to provide consent."

address [their] specific questions and comments related to the campus SRO . . . at that time." Thus, on the instant record, concluding that Wagnon acted contrary to the usual school policy, i.e., sharing very little personal information regarding students with the SROs, would require rank speculation, which cannot satisfy the Wilsons' summary judgment burden. *See Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (non-movant cannot avoid summary judgment by presenting speculation).

The Wilsons' evidence similarly fails to support a reasonable inference that an officer with Baker's experience and training would, without more, have gleaned an adequate understanding of S.W.'s particular disability, resulting limitations, and appropriate accommodations simply by reviewing the report of the January 7, 2014 incident prepared by Slusser. If anything, the report demonstrates why Wagnon repeatedly asked the Wilsons for information from S.W.'s health care providers, and sought permission for the school district to communicate directly with the providers and conduct its own psychological evaluation of S.W.

Finally, nothing in the record suggests that the conciliatory response advocated by the Wilsons would have successfully remedied this situation. Given the negative progression of events on January 7, 2014, as detailed in Slusser's report, and the evident escalation on January 23, 2014, there is no indication that S.W. would not have continued to attempt to hit or kick Wagnon, or one of the officers, if Baker had not handcuffed S.W. when he did. Notably, Wagnon believed S.W. to be an "[im]minent danger to himself or others on January 23rd." She also "believed[] that the physical restraint [used] on S.W. was done for [the purpose of protecting the health and safety of S.W. and others,]" and that use of "a restraint" was reasonable on that occasion because S.W. caused "everything [to] escalate[] so quickly." And, while it is conceivable that Slusser and Baker could have physically restrained S.W. without using handcuffs, the record likewise provides no assurance that

the alternative means would have worked as effectively in shielding those present from continued hits, kicks, or other physical assaults,[8] or that such efforts would not have resulted in S.W., or someone else, being injured.[9]

Certainly, the efforts made by Wagnon, Slusser, and Bailey, on January 23, 2014, to maintain any semblance of order prior to Baker's arrival on the scene were, for the most part, failing. Furthermore, according to Baker's, Slusser's, and Wagnon's written reports of the January 23 incident, when S.W. was no longer handcuffed and was being carried out of the school by his father, he grabbed a glass container from Wagnon's credenza and threw it, causing it to break, and then punched Slusser's forehead hard enough for it to turn red and sting. And, immediately before S.W.'s father picked [him] up, "[S.W.] growled and charged at [Wagnon]."

Notably, the efforts that Wagnon and Slusser made, on January 7, 2014, to calm S.W. such that he could complete his schoolwork also had failed. According to Slusser's October 5, 2020 declaration, S.W. never calmed down while in Wagnon's office. Rather, S.W.'s parents had to remove him from the school.

On this evidentiary showing, the Wilsons have failed to show the existence of a genuine dispute of material fact relative to their Rehabilitation Act and ADA reasonable accommodations claims. Accordingly, the district court properly dismissed it.

---

[8] For example, if Baker and Slusser had simply held S.W.'s arms, they likely would have remained in kicking, lunging, biting, headbutting, and/or spitting range.

[9] Bailey's January 23, 2014 statement concludes: "Today was the angriest and scariest I have ever seen [S.W.]. He wanted to hurt someone and someone was going to get hurt today—him, Ms. Wagnon, myself, the officers—with the way he was continuing to escalate."

No. 21-10771

### B. Disparate Treatment

The dearth of record evidence providing a reasonable inference that Baker was adequately apprised of S.W.'s disability, its corresponding limitations, *and* necessary accommodations, likewise dooms the Wilsons' contention that Baker intentionally discriminated against S.W. "by reason of" S.W.'s *disability*. Rather, Baker's limited familiarity with S.W.'s previous misbehavior—culminating in Slusser's call for assistance on January 23, 2014—suggests the contrary, i.e., that Baker's actions were motivated by S.W.'s escalating *misconduct*, not a disability. Certainly, given the negative progression of events on January 7, 2014, and the evident escalation on January 23, 2014, there is no indication that S.W. would not have continued to attempt to hit or kick Wagnon, or one of the officers, if Baker had not handcuffed S.W. when he did.[10]

Nor does the addition of Baker's heated verbal exchange with S.W. —a captive eight-year old student—during which Baker, for a time, certainly lost his temper, spoke in a harsh and elevated manner, and referred to S.W. as a "brat" and "punk," warrant a different inference. Putting aside the inflammatory nature in which it was delivered, much of Baker's message was simply that it is unacceptable and dangerous for students to threaten, hit, kick, or throw things at school personnel or police officers; that the principal

---

[10] The police department's internal affairs report concluded that S.W.'s "violent behavior . . . was cause for the officers to . . . handcuff the student for his safety and the safety of the school staff and officers." The police chief's February 10, 2014 memorandum likewise reflects that Baker was terminated because of his verbal interaction with S.W., on January 23, 2014, not his decision to handcuff the student. Regarding the latter topic, the memorandum states: "On January 23, 2014, you responded to Carroll Elementary School at the request of Officer Robert Slusser. Upon arrival[,] you contacted an 8 year old second grade student who had assaulted the school principal and Officer Slusser. In order to protect the student, the principal, and officers, you took the student into custody by restraining his hands with handcuffs."

and other school personnel were trying to help S.W.; that, for those efforts to succeed, S.W. had to cooperate and behave; and that adverse actions yield adverse consequences. Furthermore, even if ill-advised and unprofessional, Baker's chosen verbiage is not inherently discriminatory, or generally associated with a protected disability.

Finally, there is no indication that Baker would not have delivered the same message, in the very same manner, to a *non-disabled* student who—despite previous efforts by school personnel and Slusser to bring about good behavior by utilizing de-escalation techniques—acted as S.W. did on January 7 and 23. Thus, even if the police chief's characterization of Baker's verbal interaction with S.W. (as "berating, demeaning, and antagonizing a student clearly in distress") is befitting, nothing suggests that Baker's conduct was motivated by S.W.'s disability.

## VI.

In affirming the district court's summary judgment dismissal of the Wilsons' claims, we recognize that one might reasonably argue that an SRO may *never* appropriately engage *any* eight-year old student in a verbal exchange akin to that which occurred between Baker and S.W. on January 23, 2014. Indeed, we note Baker's employment was terminated as a result of that exchange. Significantly, however, the Rehabilitation Act and Title II of the ADA do *not* provide a legal remedy for *all* unreasonable, inappropriate, unprofessional, and/or unduly harsh conduct by public agents. Rather, these statutes provide a damages remedy *only* to protected persons in limited circumstances, that is, when the public agent utilizes such conduct whilst interacting with someone the actor knows to be a qualified person with a disability, and resulting limitations necessitating certain action or inaction are both known *and* disregarded. Because the Wilsons have not put forth evidence demonstrating the existence of a genuine dispute regarding these

elements, the district court properly dismissed their ADA and Rehabilitation Act intentional discrimination claims.

For the reasons stated herein, the district court's July 9, 2021 judgment, dismissing with prejudice the ADA and Rehabilitation Act claims asserted by Plaintiffs-Appellants Chad and Martha Wilson, individually and as next friends of S.W., is AFFIRMED.